UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW JERSEY

Civil Action No. 06CV4449 NLH

| | |
|---|---|
| Joseph Oats Holdings, Inc., Biothane Corporation, Robert Sax, Michael Holtz, Graig Rosenberger, Martin Kaplan, Ronald Kaplan, John Murphy, and RCM Biothane, LLC, a nominal plaintiff, | ) ) ) ) ) |
| Plaintiffs and Defendants-in-Counterclaim, | ) ) |
| v. | ) ) |
| RCM Digesters, Inc. and Mark Moser, individually, | ) ) |
| Defendants and Plaintiffs-in-Counterclaim, | ) ) ) |
| and | ) ) |
| Mark Moser, in his official capacity as a Member of and on behalf of RCM Biothane, LLC, derivatively, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| Joseph Oats Holdings, Inc., Robert Sax, Michael Holtz, Graig Rosenberger, Martin Kaplan, Ronald Kaplan, and John Murphy, | ) ) ) ) |
| Defendants | ) ) |
| and | ) ) |
| Mark Moser, | ) ) |
| Third-Party Plaintiff, | ) ) |
| v. | ) ) |
| Joseph Oat Companies, Inc., | ) ) |
| Third Party Defendant. | ) ) |

**THIRD-PARTY COMPLAINT
AND DEMAND FOR
JURY TRIAL**

## The Parties

1.     Third-Party Plaintiff, Mark Moser, is a citizen of the State of California residing at 494 Capricorn Avenue, Oakland, California 94611.

2.     Third-Party Defendant Joseph Oat Companies, Inc., (JOC) is a corporation organized under the laws of the state of New Jersey with a principal place of business located at 2500 Broadway, Camden, New Jersey.

## Jurisdiction

3.     The Court has jurisdiction over these third-party claims pursuant to 28 U.S.C. § 1332, because Mr. Moser and JOC are citizens of different states and the amount in controversy exceeds $75,000. Venue in this Court is appropriate as a substantial part of the events giving rise to the claims in this matter occurred in this district.

## Facts

4.     On or about April 21, 2005, Mr. Moser, and a Limited Liability Company in which he owned a minority interest, RCM Biothane, LLC, executed an Employment Agreement, pursuant to which Moser was the "Managing Director"of RCM Biothane.

5.     The Employment Agreement entitled Mr. Moser to a minimum annual bonus of $100,000 on each of April 21, 2006, April 21, 2007, and April 21, 2008.

6.     Under the Operating Agreement for RCM Biothane, Joseph Oat Holdings, Inc. (JOHI) a related company to Third-Party Defendant JOC, agreed to pay Mr. Moser's bonus directly to him, which payment was to be credited as a capital contribution to JOHI's capital account with RCM Biothane.

2

7.      Mr. Moser also was owed a $100,000 anniversary payment pursuant to the Asset Purchase Agreement between him and RCM Biothane.

8.      On or about April 21, 2006, JOHI established an escrow account for Mr. Moser in the amount of two hundred thousand dollars ($200,000) ("escrow funds"), equal to certain payments then owed to him by JOHI under the Employment Agreement and Asset Purchase Agreement.

9.      The escrow funds due to Mr. Moser never were given to him and, instead, without his knowledge or consent, such funds were instead improperly obtained by Joseph Oat Companies, Inc.

10.     Joseph Oat Companies, Inc. retained the escrow funds.

## THIRD PARTY CLAIM ONE
### Conversion

11.     Third-Party Plaintiff repeats and realleges herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

12.     JOC intentionally and willfully obtained and took possession of Mr. Moser's escrow funds without his permission.

13.     The escrow funds held by JOC are the exclusive property of Mr. Moser.

14.     JOC's improper assumption and exercise of dominion and control over the escrow funds has and will continue to interfere with and diminish Mr. Moser's rights in that property.

15.     Allowing JOC to retain the benefits it received as a result of its wrongful acts would unjustly benefit it at Mr. Moser's expense.

3

16.     As a direct and proximate result of JOC's actions, Mr. Moser has suffered harm.

17.     Mr. Moser is entitled to an award of the value of the property taken, with interest, and other damages in an amount to be proven at trial.

### THIRD PARTY CLAIM TWO
### Unjust Enrichment

18.     Third-Party Plaintiff repeats and realleges herein the allegations set forth in the foregoing paragraphs of this Third-Party Complaint as if each such allegation was fully set forth herein.

19.     JOC unjustly received benefits at the expense of Mr. Moser through its wrongful conduct, namely, obtaining funds in an escrow account established for Mr. Moser in the amount of two hundred thousand dollars ($200,000) without Mr. Moser's knowledge or consent.

20.     JOC continues to unjustly retain the escrow funds at the expense of Mr. Moser. It would be unjust for JOC to retain any value it obtained as a result of its wrongful conduct.

21.     JOC received substantial benefits from its inequitable behavior at the expense of Mr. Moser.

22.     Retention of the benefits that JOC received at Mr. Moser's expense would be unjust.

23.     Mr. Moser accordingly is entitled to full restitution of all amounts in which JOC has been unjustly enriched at his expense.

DMEAST #9920791 v1

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Moser prays for entry of judgment declaring:

A.      That JOC pay to Mr. Moser all ill-gotten gains unjustly obtained and retained by it through the acts complained of here;

B.      that Mr. Moser is granted interest on the damages caused to him by reason of JOC's actions;

C.      that JOC pay to Mr. Moser his attorneys' fees;

D.      that costs and interest are awarded to Mr. Moser; and

E.      that Mr. Moser be granted such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Mr. Moser hereby demands a trial by jury.

Respectfully submitted,

MARK A. MOSER,
By His Attorneys:

*William J. DeSantis*

Joseph H. Kenney
William J. DeSantis
Plaza 1000-Suite 500
Main Street
Voorhees,NJ 08043-4636

March 31, 2008

(by *Pro Hac Vice*)
James C. Duda
Bulkley. Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, MA 01115

5

DMEAST #9920791 v1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

Civil Action No. 06CV4449 NLH

Joseph Oats Holdings, Inc., Biothane Corporation,   )
Robert Sax, Michael Holtz, Graig Rosenberger,   )
Martin Kaplan, Ronald Kaplan, John Murphy,   )
and RCM Biothane, LLC, a nominal plaintiff,   )
  )
      Plaintiffs and Defendants-in-Counterclaim,   )
  )
v.   )
  )
RCM Digesters, Inc. and Mark Moser, individually,   )
  )
      Defendants and Plaintiffs-in-Counterclaim,   )
  )
        and   )
  )
Mark Moser, in his official capacity as a Member   )
of and on behalf of RCM Biothane, LLC,   )
derivatively,   )
          Plaintiff,   )
  )
v.   )
  )
Joseph Oats Holdings, Inc., Robert Sax,   )
Michael Holtz, Graig Rosenberger, Martin   )
Kaplan, Ronald Kaplan, and John Murphy,   )
  )
        Defendants   )
  )
        and   )
  )
Mark Moser,   )
        Third-Party Plaintiff,   )
  )
v.   )
  )
Joseph Oat Companies, Inc.,   )
        Third Party Defendant.   )

**VERIFIED FIRST AMENDED
COUNTERCLAIM AND
DEMAND FOR JURY TRIAL**

Without waiving their rights to submit any responsive pleading or motion contemplated by the Federal Rules of Civil Procedure, including additional counterclaims, within the time provided by the Federal Rules, Defendants and Plaintiffs-in-Counterclaim RCM Digesters, Inc. ("RCM Digesters") and Mark Moser, individually and in his official capacity as a Member of and on behalf of RCM Biothane, LLC, (collectively, "Counterclaimants") hereby submit Counterclaims against Plaintiffs and Defendants-in-Counterclaim Joseph Oat Holdings, Inc. ("JOHI"), Biothane Corporation, Robert Sax, Michael Holtz, Graig Rosenberger, Martin Kaplan, Ronald Kaplan, and John Murphy, and nominal plaintiff and Counterclaim Defendant RCM Biothane ("RCM Biothane") (collectively, "Counterclaim Defendants") and represent as follows:

### The Parties

1.      Counterclaimant RCM Digesters is a corporation organized under the laws of the state of Delaware with a principal place of business in Oakland, California.

2.      Counterclaimant Mark Moser is a citizen of the State of California residing at 494 Capricorn Avenue, Oakland, California 94611.  Mr. Moser organized and is the president of RCM Digesters.  Mr. Moser is the former Managing Director and a Member of RCM Biothane.

3.      On information and belief, Counterclaim Defendant JOHI is a corporation organized under the laws of the State of New Jersey with a principal place of business located at 2500 Broadway, Camden, New Jersey.

4.      On information and belief, Counterclaim Defendant Biothane Corporation ("Biothane") is a corporation organized under the laws of the state of New Jersey with a principal place of business located at 2500 Broadway, Camden, New Jersey.

5.      JOHI claims to own all of the outstanding capital stock of Biothane.

6.     On information and belief, Counterclaim Defendant Robert Sax is a citizen of the Commonwealth of Pennsylvania and is president and a member of the RCM Biothane Board of Managers ("BOM").  On information and belief, Sax has a substantial financial interest in JOHI.

7.     On information and belief, Counterclaim Defendant Michael Holtz is a citizen of the State of New Jersey and is a member of the RCM Biothane BOM.  On information and belief, Holtz has a substantial financial interest in JOHI.

8.     On information and belief, Counterclaim Defendant Graig Rosenberger is a citizen of the State of New Jersey and is a member of the RCM Biothane BOM.  On information and belief, Rosenberger has a substantial financial interest in JOHI.

9.     On information and belief, Counterclaim Defendant Martin Kaplan is a citizen of the State of Florida and is a member of the RCM Biothane BOM.  On information and belief, Martin Kaplan has a substantial financial interest in JOHI.

10.     On information and belief, Counterclaim Defendant Ronald Kaplan is a citizen of the State of New Jersey and is a member of the RCM Biothane BOM.  On information and belief, Ronald Kaplan has a substantial financial interest in JOHI.

11.     On information and belief, Counterclaim Defendant John Murphy is a citizen of the State of New Jersey and is a member of the RCM Biothane BOM.  On information and belief, John Murphy has a substantial financial interest in JOHI.

12.     Counterclaim Defendants Sax, Holtz, Rosenberger, Martin Kaplan, Ronald Kaplan, and Murphy are hereinafter referred to collectively as "Individual Counterclaim Defendants."

13.     Counterclaim Plaintiff RCM Biothane, LLC is a non-functioning, limited liability company organized under the laws of the state of Delaware.

14.     RCM Biothane was created out of the assets of RCM Digesters.

## FACTUAL BACKGROUND

**A.     Mark Moser, an expert in agricultural waste treatment systems, organized RCM Digesters more than twenty years ago.**

15.     Mr. Moser is a widely know expert in the design and operation of agricultural waste treatment systems using farm anaerobic digesters and related processes.  He has designed about half of the farm digesters operating in the United States today and consults for farms and governments all over the world.

16.     The systems he designs involve the treatment of agricultural wastes using anaerobic digestion and solids separation to produce energy and material for fertilizer.  An anaerobic digester is a vessel containing bacteria that break down organic wastes such as manure without air and produce methane and nutrients as byproducts.  The methane is a burnable gas that is used to fuel generators and boilers, usually on farms.  The fertilizers recovered by the anaerobic digester include nitrogen, phosphorus and potassium.

17.     In 1982, Mr. Moser began doing business as RCM Digesters and began to develop the RCM mark as a valuable trademark in the digester and agricultural waste treatment market.

18.     RCM Digesters, Inc. was incorporated in 2001.

19.     RCM Digesters became known for its ability to design successful agricultural waste treatment systems involving digesters.  For many years, it was the only active farm digester company in the United States.

20.     The success of RCM Digesters and its products resulted from the development of proprietary technology, know-how, and other valuable intellectual property of Mr. Moser.

21.     On information and belief, Biothane Corporation and its affiliated corporation, Biothane Systems International, build systems for the treatment of industrial wastewater.  Until

acquiring the assets of RCM Digesters and Mr. Moser's know-how and proprietary information, Biothane had virtually no capabilities in the field of manure digesters.

**B.      Over the course of several years of marketing and design work, RCM Digesters secured the Nebraska BioClean – Mead Project ("NBC Mead Project").**

22.     In 1999, Vic Schlesinger, a founder of Prime, Inc., contracted with RCM Digesters to prepare a feasibility study of a potential digester to be built at a feed lot to produce methane to fuel an ethanol production plant.

23.     Thereafter, based in substantial part upon RCM Digester's feasibility study, Mr. Schlesinger and David Halberg of Prime, Inc. developed a plan for an integrated ethanol production facility, feedlot, digester, and agricultural waste treatment facility (the "Project"), which they originally planned to build near Pierre, South Dakota.  The Project would involve the collection of manure from a cattle feedlot, digestion of the manure to produce methane, recovery of the solid by-product for compost, use of the methane to fuel boilers in an ethanol production plant, and use of the compost to fertilize agricultural fields on which corn and other animal feed would be grown.  The Project would involve manure from tens of thousands of cattle to be digested to supply fuel for boilers for an ethanol plant that would generate more than 20 million gallons per year of ethanol, which would be sold as a commercial product.

24.     RCM Digesters that year agreed to study and supply required information on manure properties for the design of the manure collection system to be incorporated into the Project and developed the initial data requirements for the design of the Project's digester processes.

25.     In December of 2000, Prime, Inc. issued a Request for Qualifications (RFQ) to design, build, and initiate operation of the anaerobic digester and an associated solids and nutrient removal system as a turnkey project.

26.     In response to the RFQ, RCM selected a design and construction team and prepared the team's response.

27.     During 2001, and pending award of the RFQ, RCM continued to consult on potential manure collection processes and began a study of the amount of methane gas likely to be generated from the type and amount of manure available for the Project.

28.     In 2002, Prime, Inc. awarded to RCM Digesters the design contract for the digesters and associated solids and nutrient removal system for the Project.

29.     RCM Digesters subsequently spent eight months developing the plans, specifications, and cost estimates for the digesters for the Project.

30.     RCM Digesters also spent approximately ten months and over $30,000 of its own resources for pilot studies of digestion processes for the type of cattle raising system planned for the Project.  The information from the studies would be used to develop the guarantee that would be given to the Project owner regarding the performance of the digester system ("Digester Performance Guarantees").

31.     In response to project approval delays in South Dakota, the principals of Prime, Inc. founded Nebraska Bioclean – Mead, LLC ("NBC Mead") and transferred the Project to Mead, Nebraska ("NBC Mead Project") in early 2003.

32.     RCM Digesters subsequently provided component pricing and project layouts for the digester portion of the NBC Mead Project, and further negotiated its scope.

33.     At the request of RCM Digesters, Crom Corp., a construction tank specialist, preliminarily agreed with RCM and NBC to provide general contractor services for the construction phase of implementing RCM Digesters' design work for the Project.

34.     In July of 2004, financial underwriters for the NBC Project accepted the qualifications of RCM Digesters and approved its participation in the Project, based in substantial part upon its experience with large scale, high strength organic waste digesters.

35.     In or about July of 2004, RCM Digesters began discussions with NBC about providing an upgraded nutrient removal system for the Project's digesters.

36.     The NBC Mead Project was the largest and single most lucrative agricultural waste treatment project that RCM Digesters had ever secured.

**C.     Counterclaim Defendant Biothane Corporation induced Mr. Moser to sell RCM Digester assets to create RCM Biothane, LLC.**

37.     In or about the summer of 2004, representatives of Counterclaim Defendant Biothane Corporation contacted Mr. Moser and invited him to Biothane's offices to discuss potential collaborations.

38.     On information and belief, Biothane Corporation at that time had little or no knowledge of manure digester technology and processes.

39.     At or about this time, Biothane representatives expressed to Mr. Moser their interest in buying RCM Digesters, Inc. and proposed a new name for the company: "RCM – Biothane."

40.     At or about this time, Biothane Corp. executed a Confidentiality Agreement by which it agreed to keep confidential RCM Digester information regarding, *inter alia*, its technology, including product specifications, production processes and methods.

41.     In that Agreement, Biothane Corp. agreed that all information that RCM Digesters provided to it relating to RCM Digesters' contracts, business, and technology, including but not limited to information relating to pricing, databases and software, designs, processes, equipment, construction, and operations, would be considered confidential unless Biothane obtained RCM Digesters' confirmation otherwise.

42.     In that Agreement, Biothane Corp. agreed that it would not use RCM Digester confidential information, "internally or externally," for Biothane's "own gain" or "technology development purposes" except as "expressly" permitted by RCM Digesters.

43.     In that Agreement, Biothane agreed that the furnishing of confidential information to it by RCM Digesters did not constitute a license to use that information.

44.     In that Agreement, Biothane agreed that its confidentiality obligations would be effective for six years.

45.     In that Agreement, Biothane also agreed to pay to RCM Digesters "all damages and expenses" that RCM incurred as a result of any breach of the Agreement by Biothane.

46.     In a meeting in or about August of 2004, RCM Digesters provided Biothane with, *inter alia*, its trade secret list, which included design values, design models, report formats, standard plan sets, equipment design, operations information, digester design information, effluent tanks and solids separation information, and underground piping and engine room layouts, designs, and specifications.

47.     At or about that time, Biothane suggested that it could help RCM Digesters on the NBC Mead Project by providing general contracting services.

48.     By letter dated August 20, 2004, NBC sent to Mr. Moser a letter of understanding "of the general terms and conditions that will govern the relationship between the project owner, Nebraska BioClean – Mead ('NBC Mead') and Resource Conservation Management, Inc. ("RCM"), whose process technology NBC has selected for the anaerobic digestion (AD) system component of the Integrated BioRefinery 'insertion project' in Mead, NE." Mr. Halberg concluded the letter by stating, "We look forward to successfully completing this innovative project, and to a long and profitable relationship in the future."

49.     In a meeting with Biothane representatives, Biothane agreed that, if they were to collaborate on the Project, RCM Digesters and Mr. Moser would "get credit for NBC."

50.     On August 26, 2004, Counterclaim Defendant Sax wrote to Mr. Moser, in pertinent part, "I look forward to receiving from you the electronic information (drawings and specs) available on the Nebraska ethanol/feed lot project so that we may start focusing on how we can help."

51.     On August 27, 2004, with the understanding that the NBC Mead Project would remain his company's project, Mr. Moser suggested to NBC that Biothane be considered as a replacement general contractor for Crom Corp., which had indicated an inability to perform. NBC agreed that Biothane may be a good "backup" option and authorized Mr. Moser to share Project information with Biothane.

52.     During the fall of 2004, RCM Digesters and Biothane Corp. negotiated a possible purchase of RCM's assets.

53.     On November 5, 2004, RCM Digesters, Biothane, and JOHI executed a Memorandum of Understanding ("MOU"), which outlined formation, operations, and control issues involving the to-be-created "RCM-Biothane."  The MOU stated, *inter alia*, that affiliates of JOHI will provide equipment and services to RCM Biothane customers "at cost" and "with no margin or profit built into pricing to RCM-Biothane."

54.     In furtherance of those negotiations, on November 9, 2004, Counterclaim Defendant Robert Sax, acting on behalf of Biothane, expressly affirmed in writing that, if Mr. Moser were to go forward with the deal and sell his company's assets, the company to be newly formed out of those assets -- RCM Biothane -- would be the benefactor of the NBC Mead Project, including "all margins."

55.     Sax also expressly affirmed in that correspondence to Mr. Moser that the NBC job was "considered a RCM - Biothane project, regardless of when awarded," and that "all margins on equipment, engineering hours, installation work etc belong to RCM - Biothane."

56.     Sax further expressly affirmed in that correspondence that "[t]he only relationship between RCM-Biothane and Biothane on this or any other project taken by RCM-Biothane" would be "agreed-upon contracted labor hours to undertake equipment procurement and design services."

57.     Mr. Sax further also affirmed in his November 9, 2004, correspondence to Mr. Moser that "[t]he equipment is bought, and the installation work is performed, in the name of RCM-Biothane, and any margins on this work belong to RCM-Biothane."

58.     In that correspondence, Sax also expressly acknowledged: "This is an essential point for you because the profitability of RCM-Biothane, and therefore your earnout and distribution, [will be] only affected by labor hour costs assigned to Biothane . . . ."

59.     Also in early November of 2004, Counterclaim Defendants Martin Kaplin and Murphy assured Mr. Moser that, under the proposed deal, Biothane Corp. would provide services to RCM Biothane "at cost" with no margin to Biothane.

60.     On November 11, 2004, Counterclaim Defendant Sax wrote to Mr. Moser that, if the parties were to go forward with the deal, "[n]o Biothane hours will be consumed on any project unless specifically requested by RCM-Biothane and, of course, only actual hours expended on RCM-Biothane work will be charged."

61.     On November 27, 2004, Sax again affirmed: "All contracts for ag-waste manure digestion projects in the U.S. and Canada will be taken by RCM-BC regardless of how these projects were initially identified.  Biothane sales personnel will present themselves as RCM-BC when discussing potential ag waste manure projects with customers."

62.     On December 14, 2004, Sax again affirmed that, under the proposed deal, "all projects in the process of development shall be considered as RCM-Biothane projects."

63.     In or about December of 2004, NBC paid RCM Digesters $15,000 to continue developing the layout and updating pricing of the agricultural waste portion of the NBC Mead Project.

64.     At or about that time, RCM Digesters submitted a Process Flow plan, a floor plan, and pricing for the nutrient removal portion of the agricultural waste treatment process for the Project (the "Nutrient Removal" or "NR" system).

65.     On January 18, 2005, a representative from NBC wrote to Mr. Moser to confirm that NBC would like to meet with Mr. Moser and Biothane representatives to introduce Biothane to the NBC Mead Project.  NBC also asked Mr. Moser at that time for further information regarding price confirmation, the scope of services his company would provide for the Nutrient Removal system, warranties, retainages, and the construction completion schedule.

66.     NBC representatives subsequently met with Biothane representatives in substantial part because, as David Halberg of NBC wrote to Denise Johnston of Biothane, "Mark Moser has recommended [Biothane] so highly to [NBC]."

67.     On January 29, 2005, Mr. Halberg also wrote to Counterclaim Defendant Robert Sax, *inter alia*, to "restate our mutual understanding to date."  In that letter, Mr. Halberg identified "*RCM-Biothane*" as the Anaerobic Digester (AD) and Nutrient Removal (NR) Sub-Contractor for the NBC Mead Project and affirmed that "*RCM-Biothane* shall provide technology, engineering, equipment and turn-key construction of the AD and NR units"; that "*RCM-Biothane* will provide AD site and general project coordination to include the construction of the CROM tanks"; that "[t]he Ethanol Plant Boilers will be specified, purchased and delivered to NBC-Mead by *RCM-Biothane*" for installation in the ethanol plant; that "*RCM-*

*Biothane* will provide warranties and performance guarantees on the Boilers to NBC-Mead"; that "*RCM-Biothane* will provide customary support to NBC-Mead to facilitate the process with the permitting agencies"; and that "*RCM-Biothane* will provide a project specific license to utilize their AD technology . . . ." (Emphasis added.) Mr. Halberg's letter also noted that "RCM has recently completed PFD and design basis of the AD unit process, including preliminary layout, and firm pricing on the majority of the equipment systems."

68.     By electronic correspondence, Counterclaim Defendant Sax subsequently confirmed with Mr. Halberg that RCM Biothane could undertake the anaerobic digester scope of work that he had outlined, and that RCM Biothane "will come back to you on supply and installation of the nutrient removal (NR) equipment . . . ."

69.     On February 1, 2005, Mr. Moser forwarded to Biothane RCM Digesters' proprietary design of the anaerobic digester process for the NBC Mead Project, including the process flow chart, which laid out the entire digester process for the NBC Mead Project; the warranties that RCM had developed for the Project, including warranties for gas production, heating value, fiber composition, capacity, and destruction and reliability; the revised Project scope, including details of the design parameters for the digester process; and details on the design for the head anaerobic digester unit for the Project. Mr. Moser also forwarded to Biothane Corp. at that time the Reports of Analysis for the "thin silage" for the Project and the Integrated Ethanol and Beef Facility Anaerobic Digestion Unit and Boiler Performance Test Run Protocols.

70.     At or about this time, Mr. Moser also forwarded to Biothane Corp. the proposal that RCM Digesters had prepared for the Nutrient Removal system for the NBC Mead Project.

71.     By memorandum dated February 5, 2005, Counterclaim Defendant Murphy wrote to Mr. Moser, with a copy to Counterclaim Defendant Sax and legal counsel, regarding

"Execution of NBC-type project w/ AD & AR."  In that memorandum, Murphy stated that, "[i]n the case of the NBC project, RCM-Biothane takes the entire contract," and noted that the contract includes "the NR step" that is, the Nutrient Removal system.  He also confirmed, "The boiler purchase will add to this contract value, as will any other changes down the road."

72.     On February 17, 2005, the RCM Biothane, LLC Certificate of Formation was executed with Counterclaim Defendant JOHI as the initial sole Member of the company.

73.     On March 14, 2005, Counterclaim Defendant Murphy requested RCM Digesters to issue a purchase order to RCM-Biothane for the supply of equipment for the Patterson Dairy Farm project, with a total cost of $419,936.22, requiring bonding.  Murphy stated that RCM-Biothane would obtain the bond and would subcontract back to RCM-Digesters for the actual purchase of the equipment.

74.     On March 26, 2005, Counterclaim Defendant Sax wrote to Mr. Moser to make clear that another new potential project in Hawaii that Mr. Moser had identified "would be an RCM-Biothane project.  RCM-Biothane would purchase from Biothane whatever additional equipment or services might be required to enable the system to treat the wastewater beyond what RCM-Biothane provides to treat the fiber waste.  As with the case of NBC, it may be that no additional equipment is necessary to treat the combination over what would be required to treat only the fiber.  In any case, RCM-Biothane takes the contract and the revenue for the total project applies as RCM-Biothane revenue.  I assume that this is what you would expect."

**D.     Mr. Moser sold the assets of RCM Digesters to RCM Biothane on the promise that the new company would retain all margins for NBC Mead and all other projects involving agricultural wastes that RCM Digesters or the new company had or would identify.**

75.     On April 17, 2005, RCM Digesters sold all of its assets to RCM Biothane pursuant to an Asset Purchase Agreement.

76.     Under the Asset Purchase Agreement, Mr. Moser was to become a member and a manager of RCM Biothane.

77.     Under the Agreement, RCM Digesters, as "Seller," sold all its assets including: RCM Digesters work in progress, which included farm digester projects and its rights and goodwill in the NBC Mead project; RCM Digesters technology; RCM Digesters goodwill; RCM Digesters trademark; RCM Digesters' sales database; and RCM Digesters' sales pipeline.

78.     The Asset Purchase Agreement "specifically acknowledged that the NBC Contract is a contract with [RCM Biothane]."

79.     On or about April 21, 2005, Counterclaim Defendant Sax, on behalf of RCM Biothane, and Counterclaim Defendant Murphy, on behalf of Counterclaim Defendant JOHI, executed a Limited Liability Company Agreement (the "Operating Agreement").

80.     Under the Operating Agreement executed between RCM Biothane and JOHI, Mr. Moser received a twenty percent (20%) interest in the new company.

81.     The Operating Agreement included, as its Exhibit E, an "Inter-Company Allocation of Business Opportunities and Inter-Company Operations and Relations," describing the relationships between RCM Biothane, JOHI's subsidiary Biothane Corporation, and other "JOHI Affiliates" (the "Opportunities Allocation Agreement").

82.     Pursuant to the Opportunities Allocation Agreement and consistent with the representations that the Counterclaim Defendants had repeatedly made to Mr. Moser to induce him to sell his assets, RCM Biothane and JOHI expressly agreed that all projects involving the treatment of agricultural wastes would belong to RCM Biothane, "exclusively."

83.     Pursuant to the Opportunities Allocation Agreement, the parties also expressly agreed that all projects originally identified by RCM involving the digestion of non-manure, "high-solids" wastes such as "stillage" would belong to RCM Biothane "exclusively."

84.     Pursuant to the Opportunities Allocation Agreement, Mr. Moser, as the Managing Director of RCM Biothane, was given the discretionary authority to subcontract with JOHI Affiliates, including Biothane Corp., for engineering and other services, but he had no obligation to enter into any such subcontract.

85.     Pursuant to the Opportunities Allocation Agreement, JOHI Affiliates were required to refer projects that were entirely agricultural waste projects to RCM Biothane without charge and no JOHI Affiliate was allowed to pursue such a project "unless [Mr. Moser] decides that RCM will decline the opportunity."

86.     In correspondence to all RCM employees on August 15, 2005, Counterclaim Defendant John Murphy characterized Biothane's involvement in the NBC Mead Project as "working as RCM-BC's external engineering source," and recognized that the NBC Mead Project "is a significant building block in securing the future of RCM-BC."

87.     On October 24, 2005, Counterclaim Defendant Murphy sent an electronic message to all RCM Biothane employees announcing the groundbreaking for the Project, and stating that the Project, which "is a very big deal in Nebraska," will be fueled by "RCM-Biothane manure digesters."

**E.     Counterclaim Defendants subsequently usurped RCM Biothane opportunities and retained all margins.**

88.     On information and belief, on April 21, 2005, on the very same day that Counterclaim Defendants entered into the Asset Purchase Agreement with RCM Digesters and Mr. Moser, and on the same day that Counterclaim Defendants Sax and Murphy executed the Operating Agreement with the Opportunities Allocation Agreement on behalf of RCM Biothane and JOHI, Biothane Corp. sent a bid – in its own name – to provide the boilers for the NBC Mead Project, at a price of $1,540,000, for which boilers RCM Digesters had provided the specifications.

89.     On information and belief, Biothane Corp. subsequently entered into a contract with NBC (or, as newly named, "E3 Biofuels") to provide the boilers for the NBC Mead Project.

90.     On information and belief, after reviewing the proposal that RCM Digesters had prepared for the Nutrient Removal system for the NBC Mead Project's agricultural waste treatment process, Biothane Corp. submitted its own proposal to NBC Mead for the Nutrient Removal system.

91.     On information and belief, in or about June of 2005, Counterclaim Defendant Biothane Corporation signed a contract in its own name with NBC (or "E3 Biofuels") to build the main part of the digester portion of the NBC Mead Project for more than $4,600,000.

92.     On information and belief, in or about June of 2005, Counterclaim Defendant Biothane entered into a contract with NBC (or "E3 Biofuels") to supply the Nutrient Removal system for the Project.

93.     By correspondence to Mr. Moser dated June 12, 2006, a representative of E3 Biofuels, the new name for NBC, complained that his company "worked with RCM and Mark Moser long before Biothane came into the picture," and stated, in pertinent part, that it "has been disconcerting how little evidence there has been from Biothane that Mark Moser is involved at all."

94.     By electronic correspondence to Mr. Moser dated August 31, 2006, Counterclaim Defendant Sax identified Mr. Moser as a "Biothane representative" and asserted that Mr. Moser is "working in support of Biothane on this (the NBC Mead) project."

95.     On information and belief, NBC's "Final Project Budget" for the Project showed in excess of $4,900,000 paid or to be paid to Biothane Corp., exclusive of the Nutrient Removal system.  On information and belief, the value of the Nutrient Removal system was in excess of $2,000,000.

96.     On information and belief, margins on the NBC Mead Project, including the Nutrient Removal system, have so far exceeded $700,000.

97.     On information and belief, substantial additional margins and returns on Project guarantees have been or will be realized by Biothane Corp. on the NBC Mead Project.

98.     Biothane Corp. has never paid to RCM Biothane any of the margins that it so far has realized on the NBC Mead Project.

99.     On information and belief, prior to August 7, 2006, Counterclaim Defendants acted to secure other contracts and contract margins for themselves, contrary to their obligations under the Operating Agreement and their fiduciary duties and other obligations to RCM Biothane and Mr. Moser.

**F.      Counterclaim Defendants hid the NBC Contract, refused to provide an accounting, and barred Mr. Moser from communicating with NBC Mead representatives.**

100.    By the fall of 2005, Biothane Corp. had virtually eliminated RCM Biothane from correspondence with the Project client, and had directed Mr. Moser not to contact NBC directly.

101.    On September 1, 2005, Mr. Moser wrote to Counterclaim Defendants Sax and Murphy, expressing concerns about Biothane Corp. taking the NBC Mead Contract, appropriating large sums of the contract monies into Biothane Corp., and refusing to share details with Mr. Moser of the NBC Mead Contract and the monies paid to Biothane Corp. under it.

102.    Mr. Moser also at or around this time complained to Counterclaim Defendant Murphy that he was receiving little communication from Biothane regarding the Project, asked Murphy for an explanation regarding Biothane purchases of equipment for the Project other than as directed by RCM Biothane, and questioned whether RCM Biothane was receiving credit for the profit from equipment mark-up for the Project.

103.    At this time, Mr. Moser also wrote to Murphy and Sax asking for a copy of the NBC Mead Contract and an accounting of the money that had been received to date from the Project.

104.    On December 5, 2005, Mr. Moser again asked Counterclaim Defendant Sax for the NBC Mead Contract and budget.

105.    Counterclaim Defendants have never provided a copy of the final NBC Mead Contract and budget to Mr. Moser.

**G.    Counterclaim Defendants took for themselves the $75,000 deposit paid to RCM Biothane on the NBC Mead Contract.**

106.    On March 30, 2005, Lin Johnson of Biothane Corp. distributed an "updated Proposal" to, *inter alia*, Lin Dorsett of NBC (or "E3 Biofuels") for the NBC Mead Project, referencing the "LOI" to be sent "tomorrow," and requesting that he "make that out to RCM-Biothane."

107.    On or about April 1, 2005, E3 Biofuels issued a Letter of Intent and a $75,000 deposit in response to the "RCM Biothane Proposal."

108.    Subsequently, on information and belief, $75,000 was deposited in a bank account in Philadelphia in the name of RCM Biothane LLC.

109.    More than one year later, in or about June of 2006, Biothane Corp. denied to Mr. Moser that the $75,000 in the RCM Biothane account in Philadelphia belonged to RCM Biothane, and instead characterized it as a "loan."

**H.    Counterclaim Defendant Biothane Corp. took the "rcmbiothane.com" and "rcmdigesters.com" domain names for itself.**

110.    On or about May 4, 2005, less than two weeks after Mr. Moser and RCM Digesters sold their assets to create RCM Biothane, Biothane Corp. registered and claimed exclusive ownership of the rcmbiothane.com domain name.

111.    On June 16, 2005, at the direction of representatives of Biothane Corp., Mr. Moser directed that the domain name rcmdigesters.com be released to Stephen Murphy at Biothane Corp. to hold in a custodial capacity until RCM Biothane's own web site became operational, at which time the rcmdigesters.com name was to be transferred to RCM Biothane to be operated as one site with rcmbiothane.com.

112.    Biothane Corp. registered and claimed exclusive ownership of the rcmdigesters.com domain name.

113.    Biothane Corp. never transferred either the rcmbiothane.com or the rcmdigesters.com domain names to RCM Biothane.

114.    Biothane paid no consideration to RCM Biothane or RCM Digesters for either the rcmbiothane.com or rcmdigesters.com domain names.

**I.    Counterclaim Defendants' prevented RCM Biothane from succeeding as an independent and viable business entity.**

115.    Under the Operating Agreement, RCM Biothane was controlled by a Board of Managers dominated by the JOHI and the Individual Counterclaim Defendants, which represented six of the seven voting Members of that Board.

116.    Beginning in April of 2005, Individual Counterclaim Defendants refused to take actions to allow RCM Biothane to establish itself as an independent company and, instead, took deliberate steps to limit its profitability to the benefit of Biothane Corp.

117.    Shortly after the creation of RCM Biothane, Counterclaim Defendant Sax, acting with the apparent authorization of the other Individual Counterclaim Defendant Managers of RCM Biothane, directed Mr. Moser to restrict RCM Biothane's personnel to marketing in the western United States, even though RCM Biothane personnel were supervising installation of numerous systems in the northeast.

118.    On or about August 1, 2005, nearly four months after RCM Biothane became operational, Mr. Moser wrote to Counterclaim Defendants Sax and Murphy and stated that, because of lack of cooperation from the JOHI Board Members, RCM Biothane had not yet obtained a bank account, a business license, insurance, or employees, and that, to date, he had been forced to run RCM Biothane using RCM Digesters' resources, including its name.

119.    Until October of 2005, RCM Biothane was forced to operate exclusively using RCM Digesters' liability insurance, bank, books, and invoicing.

120.    On information and belief, in or about December of 2005, Counterclaim Defendant Murphy caused Biothane's accountants to remove the original RCM Digesters financial records from the RCM Biothane computer.

121.    Despite numerous requests and, on information and belief, with the knowledge that their accountant had a copy of the RCM Digesters' original financial books, Counterclaim Defendants refused, and continue to refuse, to return those books.

122.    In May of 2006, the Biothane/JOHI Managers imposed approximately $300,000 in annual costs on RCM Biothane by placing Biothane employee and Counterclaim Defendant Graig Rosenberger and Biothane employee Richard Mattocks on the payroll of RCM Biothane.

123.    In May of 2006, Counterclaim Defendant Murphy ordered RCM Biothane's bookkeeper to issue a check to JOHI for $242,000 from the RCM Biothane account, ostensibly to repay JOHI on a loan, seriously weakening the company's operating position.

124.    In June of 2006, Murphy ordered RCM Biothane to pay a supplier invoice that Biothane Corp. owed.  The issuance of the check almost emptied the RCM Biothane bank account.

**J.    Counterclaim Defendants put moneys owed to Mr. Moser into an escrow account to force Mr. Moser to transfer RCM Biothane trade secrets and know how to Biothane Corporation.**

125.    Counterclaim Defendants developed and implemented a scheme to shift Mr. Moser's anaerobic digester technology and know-how from RCM Biothane, of which Mr. Moser was part owner, to Biothane Corporation, in which he had no interest, and to develop the anaerobic digester business without Mr. Moser.

126.    The scheme included "knowledge transfers" from Mr. Moser and other RCM Biothane employees to Biothane representatives.

127.    The scheme included plans for securing anaerobic digester projects for Biothane Corporation rather than RCM Biothane.

128.    In April of 2006, Counterclaim Defendant Sax informed Mr. Moser that Counterclaim Defendants would place into an escrow account $200,000 in payments due to Mr. Moser until he transferred the RCM Biothane technology to Biothane Corporation representatives.

**K.    Counterclaim Defendants altered RCM Digesters and RCM Biothane financial records.**

129.    In or about June of 2006, Mr. Moser discovered a number of accounting irregularities in the books kept by Counterclaim Defendants on behalf of RCM Biothane.

130.    On information and belief, these irregularities included an apparently fictitious entry on RCM Biothane books kept at Biothane Corp. offices showing that RCM Digesters owed RCM Biothane $300,000.

131.    On information and belief, these irregularities included a false accounting of the NBC Mead Project and of amounts owed or credited to RCM Digesters.

132.    In July of 2006, Mr. Moser traveled to Philadelphia as directed by Counterclaim Defendant Murphy to meet with accountants to review the actual books of RCM Biothane, LLC, which differed from the books in Oakland.

133.    At that meeting, Mr. Moser was given only selected printouts from the RCM Biothane books maintained by Counterclaim Defendants, who refused to give to Mr. Moser a full electronic copy of those books.

134.    From the books that were shown to him, Mr. Moser found that Counterclaim Defendants had apparently created modified books that contained significant errors or false and improper entries.

## L.    Counterclaim Defendants reacted to Mr. Moser's concerns about the bookkeeping irregularities by dissolving RCM Biothane.

135.    On July 22, 2006, Mr. Moser wrote to Counterclaim Defendants Murphy, Sax, and Rosenberger, stating that based upon a comparison of the book entries that he had been able to obtain, it was clear to him that there were now two sets of books for RCM Biothane and that he did not have access to the real books of the company.

136.    At that time, Mr. Moser asked to receive a copy of the original, unaltered books so that he could review the entries and assignments of credits and costs.

137.    In the morning of July 24, 2006, Counterclaimant Murphy wrote to Mr. Moser and Counterclaim Defendants Sax and Rosenberger, expressing, *inter alia*, his agreement that, based upon issues raised by Mr. Moser regarding bookkeeping entries, the financial statements "need revisions."

138.    In the evening of July 24, 2006 – that is, two days after Mr. Moser expressed his suspicions and later on the same day that Counterclaim Defendant Murphy wrote to Mr. Moser admitting that there were errors in the books – Counterclaim Defendant Sax wrote to all RCM Biothane Managers claiming, for the first time, that "RCMB business is staring down the gun

barrel of no receivables and the prospect of no significant new business in the immediate future. It is necessary that the Board of Managers meet to discuss how we can greatly reduce overhead expenses immediately, and how we can operate the business going forward to create profitability."

139.    This was the first time that Mr. Sax claimed that RCM Biothane was in a financial crisis.

140.    Ostensibly on the basis of the claimed financial crisis, Sax called a meeting of the RCM Biothane Board for August 7, 2006 in Camden, New Jersey.  Sax made no mention that the Counterclaim Defendants intended to dissolve RCM Biothane.

141.    At that meeting, Mr. Sax and the other Board members did not discuss profitability, but instead, *inter alia*, stated that they wished to dissolve RCM Biothane and threatened Mr. Moser with litigation and the loss of his job and business if he did not agree.

142.    Under the stated circumstances and representations of the Counterclaim Defendants, Mr. Moser agreed to dissolve RCM Biothane.

**M.    Counterclaim Defendants induced Mr. Moser to sign the "Separation Agreement."**

143.    Counterclaim Defendants prepared a document at the meeting on August 7. 2006, labeled "Separation Agreement."

144.    The Separation Agreement was based upon RCM Digesters being returned to a functioning company and receiving all receivables and assuming all payables and warranty obligations of RCM Biothane.

145.    The Separation Agreement contained certain financial data presented by Counterclaim Defendants that Mr. Moser was unable to verify at the time, and which he has since learned was substantially incorrect.

146.     The parties agreed that the financial figures in the Separation Agreement were preliminary, and the Agreement expressly stated: "All figures are subject to final review by Moser and Biothane."

147.     Mr. Moser also refused to sign the document unless ownership and coverage of the RCM Biothane insurance policies were changed to RCM Digesters, Inc., and the Separation Agreement expressly stated the RCM Biothane insurance policies would be so changed.

148.     Since the date of the Separation Agreement, Mr. Moser found that the amount of receivables due to RCM Biothane from third parties as of the date of the Agreement were at least $253,931 less than represented to Mr. Moser at the August 7, 2006 meeting.

149.     Conversely, since the date of the Separation Agreement, Mr. Moser has so far identified receivables due to RCM Biothane from Biothane Corp. for equipment, services, expenses, and unpaid margins totaling in excess of $700,000.

150.     Mr. Moser has also determined that the $75,000 paid as a deposit on the NBC Contract was improperly taken by Biothane and belonged to RCM Biothane.

151.     On information and belief, the total amount of receivables currently owed or to be owed to RCM Biothane by Biothane Corporation on the NBC Mead Project, including margins that it has not yet disclosed to RCM Biothane, is in excess of $900,000.

**N.     Counterclaim Defendants have not fulfilled their promises under the Separation Agreement.**

152.     Pursuant to the Separation Agreement, all receivables of RCM Biothane belong to RCM Digesters.

153.     The amount owed to RCM Biothane from Biothane includes $450,000 for 75% completion of NBC Mead Project, the invoice for which the Board of Managers of RCM Biothane expressly approved at its meeting on May 17, 2006.

154.    At that meeting, all Individual Counterclaim Defendants had agreed that margins on the boilers for the NBC Mead Project were to be paid to RCM Biothane.

155.    On information and belief, no later than September 11, 2006, Counterclaim Defendant Biothane received an invoice for the $450,000 margin on the NBC Mead Project.

156.    By letter dated September 19, 2006, Counterclaim Defendant Murphy informed RCM Digesters that Biothane "rejected" the invoice, and Biothane has since refused to pay that invoice.

157.    Under the Separation Agreement, Biothane promised to "cooperate fully" with Mr. Moser to facilitate his ability to carry his business going forward.

158.    Under the Separation Agreement, Biothane promised to "cooperate fully" to expeditiously restore RCM Digester's computer system independent of Biothane's computer system.

159.    Biothane has failed to cooperate in any way to facilitate Mr. Moser's ability to carry forward his business and has refused to take steps requested by RCM Digesters that would allow RCM Digesters to operate its computer system independently of Biothane Corp.

160.    Biothane and the Individual Counterclaim Defendants continue to maintain control over the rcmdigesters.com domain name and have refused to assign it to RCM Digesters or Mr. Moser.

161.    Under the Separation Agreement, Counterclaim Defendants agreed to return all documents, and to destroy all electronic files, that it received in connection with the Asset Purchase Agreement.

162.    Under the Separation Agreement, Counterclaim Defendants agreed to return all documents and electronic files it generated in pursuit of sales related to manure digestions.

163.     Biothane has returned no documents to RCM Digesters and, on information and belief, it has not destroyed electronic files received from RCM Digesters or Mr. Moser.

164.     Under the Separation Agreement, the Asset Purchase Agreement was declared "null and void," thus returning all intellectual property ostensibly transferred under that Agreement, if any, back to Mr. Moser and RCM Digesters.

165.     On information and belief, Counterclaim Defendants continue to use the technology, plans, know-how, and other confidential information and intellectual property of Mr. Moser and RCM Digesters without their permission and for the purpose of competing with them, notwithstanding the restrictions of the Confidentiality Agreement that Biothane Corp. executed with RCM Digesters, prohibiting any use whatsoever of such information.

166.     Under the Separation Agreement, Counterclaim Defendants agreed to change insurance policies to the name of RCM Digesters.

167.     Counterclaim Defendants changed no insurance policies to the name of RCM Digesters.

**O.     Counterclaim Defendant JOHI failed to pay the bonuses and to provide the benefits to which Mr. Moser is due under his Employment Agreement.**

168.     On or about April 21, 2005, RCM Biothane, LLC, and Mark Moser executed an Employment Agreement, pursuant to which Moser was the "Managing Director" of RCM Biothane.

169.     The Employment Agreement entitled Mr. Moser to a minimum annual bonus of $100,000 on each of April 21, 2006, April 21, 2007, and April 21, 2008.

170.     Under the Operating Agreement for RCM Biothane, JOHI agreed to pay Mr. Moser's bonus directly to him, which payment was to be credited as a capital contribution to JOHI's capital account with RCM Biothane.

171.    Mr. Moser's annual bonus due April 21, 2006 was placed into an escrow account to be held for the benefit of Mr. Moser but was never paid to him.

172.    Mr. Moser's Employment Agreement entitled Mr. Moser to participate in such benefit plans as JOHI made available to its executive employees.

173.    JOHI did not make participation in these benefit plans available to Mr. Moser during the course of his employment.

**P.    Counterclaim Defendants prevented Mr. Moser from earning a special bonus that Mr. Moser could earn under his employment agreement.**

174.    Mr. Moser's Employment Agreement also entitled Mr. Moser to a "special bonus" of $375,000 if RCM Biothane achieved certain income goals.

175.    The actions of the Counterclaim Defendants, including but not limited to their usurpation of RCM Biothane business opportunities and their refusal to cooperate to timely establish the company as an independent entity, prevented RCM Biothane from reaching the "special bonus" income goals established in Mr. Moser's Employment Contract.

176.    Mr. Moser was never paid a "special bonus" as provided in his Employment Agreement.

**Q.    Counterclaim Defendants misallocated income due to RCM Digesters.**

177.    Under the Asset Purchase Agreement, RCM Digesters assigned to RCM Biothane certain "Assumed Customer Contracts" that were in progress at the closing date.

178.    The Asset Purchase Agreement provided a formula for the allocation of income from the Assumed Customer Contracts, by which RCM Biothane and RCM Digesters would each be compensated for their respective costs incurred in completing the contracts, with the remaining profit margin distributed to RCM Digesters and to RCM Biothane according to a formula expressly stated in the Asset Purchase Agreement.

179.    The formula was to be based upon the proportion of hours that RCM Biothane personnel spent to complete each Assumed Customer Contract relative to the total number of hours that RCM Digesters had budgeted for the performance of the contract at the time it was executed.

180.    Biothane subsequently devised a different formula for the distribution of profit margin to RCM Digesters, which formula had the effect of depriving RCM Digesters of substantial amounts due to it under the Asset Purchase Agreement for work it completed prior to the date of that Agreement.

**R.    Counterclaim Defendant JOHI did not pay to Mr. Moser the termination payments due to him under his Employment Agreement or the Operating Agreement.**

181.    The "Separation Agreement" of August 7, 2006 did not purport to terminate any agreement between or among the parties other than the Asset Purchase Agreement.

182.    In particular, the "Separation Agreement" did not purport to terminate Mr. Moser's Employment Agreement with RCM Biothane, which he understood he was to operate until dissolution of the company was complete.

183.    On October 12, 2006, counsel for Counterclaim Defendants demanded that Mr. Moser "cease and desist from continuing to conduct business using the RCM Biothane name."

184.    By this and other related actions, Counterclaim Defendants effectively terminated Mr. Moser as Managing Director of RCM Biothane.

185.    Counterclaim Defendants have presented no evidence that they terminated Mr. Moser "for cause," as that term is defined in his Employment Agreement.

186.    Mr. Moser has informed Counterclaim Defendants that he believes he was effectively terminated without cause, but that if the actions of Counterclaim Defendants did not constitute termination without cause, their actions created "Good Reason," as that term is defined in Mr. Moser's Employment Agreement, for his resignation.

187.    The Employment Agreement provides that, if he is terminated without cause, RCM Biothane is to pay to Mr. Moser immediately upon termination all unpaid annual bonuses that he would have had an opportunity to earn if he had not been terminated.

188.    The Employment Agreement further provides that, if Mr. Moser resigns for "Good Reason," he is to be paid each of his annual bonuses that he would have had an opportunity to earn if he had not resigned on the respective anniversary of the sale of RCM Digester assets.

189.    Under the Operating Agreement, JOHI agreed to pay directly to Mr. Moser each of these bonuses.

190.    JOHI has not paid to Mr. Moser any of his annual bonuses.

191.    The Operating Agreement provides a "Formula Price" that determines the amount that Counterclaim Defendant JOHI must pay to Mr. Moser for his share of RCM Biothane.

192.    JOHI has not tendered any amount to Mr. Moser for his share of RCM Biothane.

**S.    JOHI did not pay to Mr. Moser any annual payments due to him under the Employment Agreement and Asset Purchase Agreement as required under the Operating Agreement.**

193.    The parties executed the Asset Purchase Agreement, the Operating Agreement, and Mr. Moser's Employment Agreement on or about April 21, 2005.

194.    As an inducement for Mr. Moser to execute the Asset Purchase Agreement and turn over his business to RCM Biothane, Counterclaim Defendants promised that Mr. Moser would receive $100,000 on each of the first three anniversaries of the sale ("Anniversary Payments").

195.    Under the Operating Agreement, JOHI promised to pay directly to Mr. Moser each of the Anniversary Payments promised to him, as a capital contribution to be credited to

JOHI's capital account. Under the Employment Agreement, Mr. Moser was to receive a $100,000 annual bonus on each of the first three anniversaries of that Agreement.

196.    Any apparent waiver of Mr. Moser's rights to payments under the Employment Agreement was induced by intentional misrepresentations of the Counterclaim defendants.

197.    JOHI did not pay to Mr. Moser on, or after, April 21, 2006, his Anniversary Payment as required by the Operating Agreement.

198.    Mr. Moser did not receive his annual bonus on, or after, April 21, 2006.

199.    Instead, on or about April 21, 2006, Counterclaim Defendants established an escrow account for Mr. Moser in the amount of two hundred thousand dollars ($200,000), equal to the annual payments then owed to him under the Employment and Asset Purchase Agreements.

200.    Mr. Moser's money in escrow was never given to him and, without his knowledge or consent, it was instead obtained by Joseph Oat Companies, Inc.

201.    Joseph Oat Companies, Inc. retained that money and never paid it over to Mr. Moser.

**T.    Counterclaim Defendants JOHI and Murphy libeled Mr. Moser.**

202.    In a "Notice" to all RCM Biothane employees dated October 24, 2006, Counterclaim Defendant Murphy on behalf of JOHI falsely suggested that Mr. Moser had a contractual duty to employ each of the RCM Biothane employees and falsely stated that Mr. Moser had violated that duty.

203.    In that same "Notice," Murphy and JOHI falsely suggested that Mr. Moser had violated a Preliminary Injunction of this Court.

U.   **Biothane and John Murphy illegally accessed and copied RCM Digesters electronic data.**

204.   Since August 7, 2007, Counterclaim Defendants have insisted that RCM Biothane was dissolved and that Mr. Moser could not carry out any business in the name of RCM Biothane.

205.   Counterclaim Defendants initiated the instant action against RCM Digesters and Mark Moser on September 19, 2006, and in part sought a temporary restraining order to prevent Mr. Moser from in any way using the name "RCM Biothane" to wind up its affairs.

206.   Mr. Moser agreed to end all operations of RCM Biothane and reestablished RCM Digesters in its Oakland offices.

207.   Subsequently, in early November 2006, Biothane Corporation representatives Christopher Soltys and Stephen Murphy, at the instruction of and with the knowledge and approval of Biothane Corp., John Murphy, and/or Robert Sax, secretly and remotely accessed and copied virtually all electronic files of RCM Digesters stored in Oakland, California, including files containing RCM Digester's trade secrets, design documents, plans, specifications, drawings, and other proprietary business information.

208.   The computer files of RCM Digesters were accessed and copied without authorization or knowledge of Mr. Moser or anyone else at RCM Digesters.

209.   Biothane saved the files that they copied in a location in the offices of Biothane in Camden, New Jersey.

210.   At the time that the files were copied from the computer equipment at RCM Digester's offices, that equipment was being used by RCM Digesters in interstate and foreign commerce and communication.

211.   The stolen files still exist in Biothane's offices and/or on Biothane's computer system in an accessible location to employees of Biothane and JOHI.

212.     Counterclaim Defendants have used, and continue to use, the trade secrets and proprietary information taken from RCM Digesters and Mark Moser to compete unfairly with them.

## COUNTERCLAIMS

### COUNT 1
### Fraud

(Counterclaim Defendants JOHI, Biothane Corp., Sax, Murphy, and Martin Kaplan)

213.     Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

214.     JOHI, Biothane Corp., Sax, Murphy, and Martin Kaplan intentionally and falsely represented material facts including, among others, that the NBC Mead Contract was an RCM Biothane contract, that the Contract included the Nutrient Removal system for the NBC Mead Project, that RCM Biothane had received a $75,000 deposit on that Project, and that RCM Biothane was entitled to all margins on the NBC Mead Project, and including other statements regarding the manner in which they intended to operate RCM Biothane, to allocate business opportunities to it, and to compensate Mr. Moser, all with the intent that Mr. Moser and RCM Digesters rely upon those statements.

215.     JOHI, Biothane Corp., Sax, Murphy, and M. Kaplan made such representations with the knowledge that they were false.

216.     Mr. Moser and RCM Digesters entered into the Asset Purchase Agreement, the Operating Agreement, the Employment Agreement, an Assignment, Assumption and Bill of Sale, an Assignment of Excel Files and Personal Goodwill, Assignment and Assumption of Lease with Landlord's Consent, Restrictive Covenants Agreement, Joinder, and/or other contracts in or around April of 2005 with Counterclaim Defendants JOHI, Biothane, and/or

RCM Biothane, and took other actions, in reliance upon one or more of the false representations by each of these Counterclaim Defendant and with the belief that those representations were true.

217.    JOHI, Biothane, Sax, and Murphy intentionally and falsely represented other material facts regarding, among other things, amounts of receivables owed to and payables owed by RCM Biothane, amounts owed by Biothane Corp. to RCM Biothane, the status of negotiations involving prospective RCM Biothane projects, the financial condition of RCM Biothane, amounts owed to RCM Digesters and/or Mr. Moser under the terms of the Asset Purchase Agreement, and the nature of the $75,000 paid as a deposit on the NBC Mead Project, all with the intent that Mr. Moser and RCM Digesters rely upon those statements.

218.    JOHI, Biothane Corp., Sax, Murphy, and M. Kaplan made such representations with the knowledge that they were false.

219.    Mr. Moser signed the Separation Agreement and took other actions in reliance upon one or more of the false representations by each of these Counterclaim Defendants and with the belief that those representations were true.

220.    On information and belief, the acts and/or omissions of JOHI, Biothane, Sax, Murphy, and M. Kaplan were actuated by actual malice or accompanied by a wanton and willful disregard of Mr. Moser and RCM Digesters, who foreseeably might be harmed.

221.    Each Counterclaim Plaintiff suffered substantial damage as a result of the false representations of each Counterclaim Defendant.

222.    As a result of Counterclaim Defendants fraudulent representations and activities, all agreements that Mr. Moser and/or RCM Digesters executed with any Counterclaim Defendant are void, and Mr. Moser and RCM Digesters are entitled to all benefits Counterclaim Defendants have realized as a result of their fraud, including all margins and other profit realized from or in any way related to the NBC Mead Project or other project in which RCM Biothane,

RCM Digesters, and/or Mr. Moser was involved, the return of all of intellectual property taken by Counterclaim Defendants, an order prohibiting Counterclaim Defendants from building or operating any manure digester or otherwise using, in any way, any of the intellectual property of Mr. Moser or RCM Digesters, payment to Mr. Moser of all amounts promised to him as inducements by Counterclaim Defendants, damages to compensate RCM Digesters and Mr. Moser for the harm done to their business, including business reputation and client relations, and other restitution as may be necessary to return to Mr. Moser that which was fraudulently taken from him by Counterclaim Defendants, including incidental and consequential damages.

**COUNT 2**
**Breach of Contract – Operating Agreement**
(JOHI)

223.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

224.    If the Operating Agreement was not fraudulently induced, it is a valid and enforceable contract.

225.    Pursuant to the Operating Agreement, all business opportunities available to RCM Biothane or a JOHI- affiliated entity, including Biothane, that involved the treatment of agricultural wastes and all projects involving the digestion of non-manure, "high-solids" wastes such as "stillage" (which is a product of the ethanol production process) originally identified by RCM Digesters or RCM Biothane belonged exclusively to RCM Biothane ("RCM Projects").

226.    Biothane, at the direction of JOHI and the Individual Counterclaim Defendants, took the RCM Projects, including the NBC Mead Project, for itself.

227.    Pursuant to the Operating Agreement, Mr. Moser, as the Managing Director of RCM Biothane, was given the discretionary authority to subcontract with JOHI Affiliates,

including Biothane Corp., for engineering and other services for RCM Projects, but he had no obligation to enter into any such subcontract.

228.    JOHI did not allow Mr. Moser to exercise such discretion, but instead had Biothane take RCM Projects directly.

229.    JOHI did not assure that RCM Biothane received all margins on RCM Projects, and instead prevented RCM Biothane from receiving those margins.

230.    Pursuant to the Operating Agreement, JOHI agreed to make certain payments directly to Mr. Moser and RCM Digesters, including payments required to be made to Mr. Moser under his Employment Agreement and the Asset Purchase Agreement.

231.    JOHI did not make the payments to Mr. Moser and RCM Digester as required by the Operating Agreement.

232.    As a direct and proximate result of Counterclaim Defendant JOHI's breaches, RCM Digesters and Mr. Moser have been and will continue to be harmed.

## COUNT 3
### Breach of Contract – Separation Agreement
(All Counterclaim Defendants)

233.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

234.    If the Separation Agreement was not fraudulently induced, it is a valid and enforceable agreement.

235.    Counterclaim Defendant have failed to satisfy the terms of the Separation Agreement by failing to pay, or cause to be paid, receivables due from Biothane Corp. to RCM Biothane.

236.    Counterclaim Defendants have violated the terms of the Separation Agreement by refusing to exercise good faith to allow Mr. Moser the ability to complete his review of the

figures stated in the Separation Agreement and to determine the amount of additional receivables that Biothane Corp. owes to RCM Biothane.

237.    Counterclaim Defendants have failed to satisfy the terms of the Separation Agreement by failing to assist RCM Digesters to commence operations as a separate and distinct business.

238.    Counterclaim Defendants have failed to satisfy the terms of the Separation Agreement by failing to return all documents and to destroy all electronic files that they received in connection with the Asset Purchase Agreement.

239.    Counterclaim Defendants have failed to satisfy the terms of the Separation Agreement by failing to return all documents and electronic files it generated in pursuit of sales related to manure digestions.

240.    Counterclaim Defendants have failed to satisfy the terms of the Separation Agreement by failing to change ownership and coverage of insurance policies to the name of RCM Digesters.

241.    Counterclaim Defendants have failed to satisfy the terms of the Separation Agreement by continuing to use the technology, plans, know-how, and other intellectual property of Mr. Moser and RCM Digesters without their permission.

242.    On information and belief, Counterclaim Defendants have failed to satisfy the terms of the Separation Agreement by making statements to current and future clients that are damaging to Mr. Moser's business.

243.    As a direct and proximate result of defendants' breaches, Counterclaimants have been and will continue to be harmed.

**COUNT 4**
**Breach of Contract – Separation Agreement**
(Biothane)

244.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

245.    If the Separation Agreement was not fraudulently induced, it is a valid and enforceable agreement.

246.    Counterclaim Defendant Biothane has failed to satisfy the terms of the Separation Agreement by failing to cooperate in any way to facilitate Mr. Moser's ability to carry forward his business, by refusing to assign back to RCM Digesters it domain name, and by refusing to take any steps that would allow RCM Digesters to operate its computer system independently of Biothane.

247.    Counterclaim Defendants have failed to satisfy the terms of the Separation Agreement by failing to pay to Mr. Moser according to the hourly rate specified in the Agreement for Mr. Moser's work on the NBC Mead Project.

248.    As a direct and proximate result of defendants' breaches, Counterclaimants have been and will continue to be harmed.

**COUNT 5**
**Breach of Covenant of Good Faith and Fair Dealing**
(JOHI, Biothane, and each of the Individual Counterclaim Defendants)

249.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

250.    If the Operating Agreement, Employment Agreement, and Separation Agreement were not fraudulently induced, they are valid and enforceable contracts.

251.    Each of the Agreements contained an implied covenant of good faith and fair dealing.

252.    JOHI, Biothane, and each of the Individual Counterclaim Defendants took or abetted in arbitrary and unreasonable actions having the effect of destroying or injuring the rights of RCM Digesters and/or Mr. Moser to receive the fruits of the Agreements.

253.    The conduct of JOHI, Biothane, and each of the Individual Counterclaim Defendants with respect to, *inter alia*, the NBC Mead Project frustrated the overarching purpose of the Agreements by taking advantage of their positions to control implementation of the terms of the Agreements.

254.    On information and belief, that the acts and/or omissions of JOHI, Biothane, and each of the Individual Counterclaim Defendants were actuated by actual malice or accompanied by a wanton and willful disregard of Mr. Moser, who foreseeably might be harmed.

255.    As a direct and proximate result of Counterclaim Defendants conduct, Counterclaimants have been harmed and will continue to be harmed.

**COUNT 6**
**Breach of Fiduciary Duty**
(JOHI and each of the Individual Counterclaim Defendants)

256.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

257.    JOHI and each of the Individual Counterclaim Defendants had a dominant position over Mr. Moser in connection with their respective relationships to and within RCM Biothane.

258.    JOHI and each of the Individual Counterclaim Defendants, as members and/or managers of RCM Biothane, owed a fiduciary duty to Mr. Moser.

259.    The fiduciary obligations of JOHI and each of the Individual Counterclaim Defendants to Mr. Moser included a duty of loyalty and a duty of good faith.

260.     By, *inter alia*, self-dealing, usurping business opportunities in favor of Biothane Corp., failing to pay margins and other amounts owed to RCM Biothane, and taking other actions having the effect of ruining RCM Biothane as a viable business, JOHI and each of the Individual Counterclaim Defendants neglected or failed to carry out their fiduciary duties to Mr. Moser.

261.     On information and belief, that the acts and/or omissions of JOHI and each of the Individual Counterclaim Defendants were actuated by actual malice or accompanied by a wanton and willful disregard of Mr. Moser, who foreseeably might be harmed.

262.     As a direct and proximate result of Counterclaim Defendants' conduct, Mr. Moser has been harmed and will continue to be harmed.

**COUNT 7**
**Breach of Contract – Employment Agreement**
(JOHI)

263.     Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

264.     If the Employment Agreement was not fraudulently induced, it is a valid and enforceable contract.

265.     The Employment Agreement provided that JOHI must have made available to Mr. Moser such benefit plans as it made available to its executive employees.

266.     JOHI did not make available to Mr. Moser such benefit plans as it made available to its executive employees.

267.     As a direct and proximate result of JOHI's breaches, Counterclaimant Moser has been and will continue to be harmed.

## COUNT 8
### Violation of the Anticybersquatting Act (15 U.S.C. § 1125(d))
#### (Biothane and Individual Counterclaim Defendants)

268. Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

269. RCM Digesters developed the RCM and RCM DIGESTERS trademarks as an internationally recognized trademark in the field of agricultural waste treatment over a period of more than twenty years.

270. The transfer of rights in the RCM and RCM DIGESTERS trademarks ostensibly encompassed within the Asset Purchase Agreement was invalid because it was induced by fraud.

271. If the Asset Purchase Agreement was not induced by fraud, it was declared "null and void" by the Separation Agreement.

272. RCM Digesters is the owner of the RCM and RCM DIGESTERS trademark.

273. Biothane and the Individual Counterclaim Defendants acquired control of the rcmdigesters.com domain name by fraud, continue to maintain control over the rcmdigesters.com domain name, and have refused to assign it to RCM Digesters or Mr. Moser.

274. RCM DIGESTERS is currently a distinctive mark and was a distinctive mark at the time of registration of the rcmdigesters.com domain name.

275. On information and belief, Biothane and the Individual Counterclaim Defendants have bad faith intent to profit from the use of the RCM DIGESTER mark by intentionally and unfairly impairing RCM Digesters and Mr. Moser from competing with them through depriving them of the use of the rcmdigesters.com domain name.

276. As a direct and proximate result of Counterclaim Defendants' actions, Counterclaimants have been and will continue to be harmed.

**COUNT 9**
**Violation of the Lanham Act: Trademark Infringement (15 U.S.C. § 1125(a))**
(Biothane and Individual Counterclaim Defendants)

277.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

278.    RCM Digesters is the owner of the RCM trademark.

279.    On information and belief, Biothane and the Individual Counterclaim Defendants have used and continue to use in commerce the RCM trademark in connection with marketing of digesters and related agricultural waste treatment systems.

280.    On information and belief, Biothane and Counterclaim Defendants have used and continue to use in commerce the RCM trademark in Biothane Corporation marketing materials that use proprietary intellectual property of RCM Digesters and Mr. Moser.

281.    On information and belief, no attribution for RCM Digesters or Mr. Moser as the source of the proprietary intellectual property is provided in said Biothane Corporation marketing materials.

282.    On information and belief, said marketing materials were displayed as recently as October 21 –25, 2006, at a national conference.

283.    Use of the RCM trademark by Biothane Corporation and the Individual Counterclaim Defendants constitutes a false designation of origin, false or misleading description of fact, and/or false or misleading representation of fact.

284.    Use of the RCM trademark by Biothane Corporation and the Individual Counterclaim Defendants is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Biothane Corporation with RCM Digesters and/or Mr. Moser, or as to the origin, sponsorship, or approval of Biothane's goods, services, or commercial activities by RCM Digesters and/or Mr. Moser.

285.    Use of the RCM trademark by Biothane Corporation and the Individual Counterclaim Defendants is in commercial advertising or promotion and misrepresents the nature, characteristics, and/or qualities of Biothane's goods, services, or commercial activities.

286.    As a direct and proximate result of Counterclaim Defendants' actions, Counterclaimants have been and will continue to be harmed.

287.    The infringement activities of Counterclaim Defendants, under the circumstances, represent an exceptional case and entitle RCM Digesters and Mr. Moser to their attorneys' fees under 15 U.S.C. §1117(a).

**COUNT 10**
**Unlawful Interference With Prospective Economic Advantage**
(JOHI, Biothane, and Individual Counterclaim Defendants)

288.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

289.    RCM Digesters and Mr. Moser had a reasonable expectation of economic advantage or benefit belonging or accruing to them from their longstanding relationship with NBC.

290.    On information and belief, JOHI, Biothane, and each of the Individual Counterclaim Defendants had knowledge of such expectancy of economic advantage.

291.    Mr. Moser and RCM Digesters had a prospective contractual relationship with NBC in connection with NBC Mead Project.

292.    JOHI, Biothane, and each of the Individual Counterclaim Defendants wrongfully and without justification, and with malice and through deceit or by wanton and willful disregard of persons who foreseeably might be harmed, intentionally interfered with Counterclaimant's expectancy of economic advantage or benefit and with Counterclaimants prospective contractual relationship by fraudulently inducing RCM Digesters and Mr. Moser to abandon their pursuit of

the NBC Contract, assign their goodwill in their relationship with NBC, and enter into the Asset

Purchase Agreement.

293.     In the absence of the wrongful acts of JOHI, Biothane, and each of the Individual

Counterclaim Defendants, it is reasonably probable that RCM Digesters and Mr. Moser would

have realized their economic advantage or benefit and their prospective contractual relationship.

294.     As a result of the actions of JOHI, Biothane, and the Individual Counterclaim

Defendants, Mr. Moser and RCM Digesters lost substantial prospective gain.

295.     As a direct and proximate result of the wrongful acts of JOHI, Biothane, and each

of the Individual Counterclaim Defendants, Counterclaimants have been and will continue to be

harmed.

**COUNT 11**
**Breach of Confidentiality Agreement**
**(JOHI, Biothane Corp., and each Individual Counterclaim Defendant)**

296.     Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the

foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

297.     On or about June 24, 2004, Biothane Corp. executed a Confidentiality Agreement

by which it agreed not to use any confidential information furnished by RCM Biothane to it for

Biothane Corp.'s own gain or technology development except as expressly permitted by RCM

Digesters.

298.     Such confidential information expressly included information relating to the

contracts, business or technology of RCM Digesters, including but not limited to all drawings,

formulae, product specifications, production procedures and methods, and all such information

was considered to be confidential unless Biothane Corp. received RCM Digesters' written

confirmation otherwise.

299.    RCM Digesters has not given express permission to Biothane Corp. to use RCM Digesters' confidential information.

300.    On information and belief, JOHI and the Individual Counterclaim Defendants knows or should know of Biothane's confidentiality obligations under the Confidential Agreement.

301.    On information and belief, Biothane, JOHI, and the Individual Counterclaim Defendants have used, are currently using, and intend to continue to use RCM Digesters confidential information in violation of the Confidentiality Agreement.

302.    As a result, Mr. Moser and RCM Digesters suffered and continue to suffer substantial damages.

**COUNT 12**
**<u>Misappropriation of Trade Secrets</u>**
<u>(JOHI, Biothane Corp., and each Individual Counterclaim Defendant)</u>

303.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

304.    Counterclaim Defendants obtained trade secrets of RCM Digesters and Mr. Moser on the basis of the promises of Biothane Corp. contained in the Confidentiality Agreement that Biothane Corp. executed on or about June 24, 2004.

305.    Counterclaim Defendants have used and disclosed, and continue to use and disclose, the trade secrets that RCM Digesters and Mr. Moser disclosed to them on the basis of Biothane Corp.'s promises contained in the Confidentiality Agreement.

306.    The use and disclosure of the trade secrets of RCM Digesters and Mr. Moser by Counterclaims Defendants constitute a breach of confidence reposed in them by RCM Digesters and Mr. Moser.

307.    As a direct and proximate result of Counterclaim Defendants' behavior, Mr. Moser has been and will continue to be harmed.

## COUNT 13
### Unjust Enrichment
### (All Counterclaim Defendants)

308.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

309.    Counterclaim Defendants unjustly received benefits at the expense of Counterclaim Plaintiffs through their wrongful conduct, including Counterclaim Defendants' interference with Counterclaim Plaintiffs' business relationships and other unfair business practices, as well as Counterclaim Defendants' computer fraud and conversion of trade secret and proprietary business information, which took substantial time and money for Counterclaim Plaintiffs to develop.

310.    Counterclaim Defendants continue to unjustly retain these benefits at the expense of Counterclaim Plaintiffs.  It would be unjust for Defendants to retain any value they obtained as a result of their wrongful conduct.

311.    JOHI, Biothane, and each of the Individual Counterclaim Defendants received substantial benefits from their inequitable behavior at the expense of Mr. Moser and RCM Digesters.

312.    Retention of the benefits that JOHI, Biothane, and each of the Individual Counterclaim Defendants received, without payment to Mr. Moser and/or RCM Digesters, would be unjust.

313.    Counterclaim Plaintiffs are accordingly entitled to full restitution of all amounts in which Counterclaim Defendants have been unjustly enriched at Counterclaim Plaintiffs' expense.

## COUNT 14
### Libel
### (JOHI and Murphy)

314.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

315.    By memorandum dated October 24, 2006, JOHI and Counterclaim Defendant Murphy communicated with each employee or former employee of RCM Biothane one or more false statements regarding Mr. Moser's compliance with contractual obligations, his fulfillment of his obligations to those employees, and his compliance with this Court's Preliminary Injunction Order.

316.    The false statements of JOHI and Counterclaim Defendant Murphy tended to harm the reputation of Mr. Moser.

317.    On information and belief, that the acts and/or omissions of JOHI and Murphy were actuated by actual malice or accompanied by a wanton and willful disregard of Mr. Moser who foreseeably might be harmed.

318.    As a direct and proximate result of Counterclaim Defendants' behavior, Mr. Moser has been and will continue to be harmed.

## COUNT 15
### Intentional Infliction of Emotional Distress
### (All Counterclaim Defendants)

319.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

320.    The conduct of JOHI, Biothane, and the Individual Counterclaim Defendants with respect to Mr. Moser in connection with, *inter alia*, the NBC Mead Contract, the operation of RCM Biothane, and the dissolution of RCM Biothane was extreme and outrageous.

321.    On information and belief, the conduct of JOHI, Biothane, and each of the Individual Counterclaim Defendants with respect to Mr. Moser was intended to inflict emotional distress, or each should have known that emotional distress was the likely result of the Counterclaim Defendant's conduct.

322.    On information and belief, the acts and/or omissions of each Counterclaim Defendant were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed.

323.    The conduct of JOHI, Biothane, and each of the Individual Counterclaim Defendants with respect to Mr. Moser was the cause of Mr. Moser's distress.

324.    The emotional distress that Mr. Moser sustained was severe.

## COUNT 16
### An Accounting
### (Biothane and JOHI)

325.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

326.    Since at least November 2006, Counterclaim Defendants have obtained business through the use of unlawful conduct including, but not limited to:

(a)    Intentionally interfering with Counterclaim Plaintiffs' prospective economic advantage with its existing and potential customers;

(b)    Improperly, willfully, and unlawfully taking commercial advantage of Counterclaim Plaintiffs' investment in its trade secrets and proprietary business information, for the purpose of sabotaging Counterclaim Plaintiffs' ability to do business and compete in the market;

(c)    Willfully converting Counterclaim Plaintiffs' confidential and proprietary data and information; and

(d)    Fraudulently accessing Counterclaim Plaintiffs' confidential and proprietary data and information, without authorization or consent, in furtherance of their unlawful and deceptive scheme as described above.

327.    Counterclaim Defendants have received money as a result of their misconduct, at Counterclaim Plaintiffs' expense, and some or all of such money is rightfully due to Counterclaim Plaintiffs.

328.    The amount of money due from Counterclaim Defendants to Counterclaim Plaintiffs is unknown to Counterclaim Plaintiffs and cannot be ascertained without an accounting of the income and gross profits Counterclaim Defendants have obtained through their wrongful and unlawful conduct.  Counterclaim Plaintiffs are entitled, therefore, to a full accounting.

## COUNT 17
### Application for Decree of Judicial Dissolution under 6 Del. C. § 18-802

329.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

330.    If the Asset Purchase Agreement and Operating Agreement were not fraudulently induced, Moser is a member of RCM Biothane.

331.    RCM Biothane has been a non-functional entity for more than one year.

332.    Accordingly, Moser, as a Member of RCM Biothane, hereby applies pursuant to 6 Del. C. § 18-802, for a decree of judicial dissolution of RCM Biothane.

## COUNT 18
### Violation of Federal Computer and Abuse Act, 18 U.S.C. §§ 1030
### (JOHI, Biothane and Individual Counterclaim Defendants)

333.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

334.    Biothane and John Murphy have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing a computer used for interstate commerce or

communication without authorization, or exceeding authorization, and by obtaining information from it.

335.     Biothane and John Murphy have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4) by knowingly, and with intent to defraud RCM Digesters and Mark Moser, accessing a protected computer without authorization, or exceeding authorized access, and by means of such conduct furthered the intended fraud and obtained one or more things of value, including but now limited to Counterclaim Plaintiffs' trade secrets and other proprietary information.

336.     Biothane and John Murphy have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A)(i) by knowingly causing the transmission of a program, information, code, or command and as a result intentionally causing damage without authorization to a protected computer, namely, the RCM NAS server.

337.     Counterclaim Plaintiffs have suffered damage and loss by reason of these violations, including, without limitation, harm to Counterclaim Plaintiffs' data, programs, and computer systems and other losses and damage in an amount to be proved at trial, but, in any event, in an amount well over $5000 aggregated over a one-year period.

338.     Due to the damage and loss caused by Biothane and John Murphy's violations as detailed above, Mr. Moser and RCM Digesters are entitled to damages and equitable relief.

### COUNT 19
### Computer Data Access and Fraud Act – Cal. Penal Code § 502
#### (JOHI, Biothane and Individual Counterclaim Defendants)

339.     Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

340.    Biothane and John Murphy have violated California Penal Code § 502(c)(1) by knowingly accessing Counterclaim Plaintiffs' data, computer, computer system or computer network, without permission, in order to wrongfully control or obtain money, property or data.

341.    Biothane and John Murphy have violated California Penal Code § 502(c)(2) by knowingly and fraudulently, and without permission, accessing, taking, copying, and making use of programs, data, and files from RCM Digesters' computers, computer system, and/or computer network.

342.    Biothane and John Murphy have violated California Penal Code § 502(c)(4) by knowingly, fraudulently, and without permission accessing and deleting or destroying data, computer software, or computer programs which reside or exist internal or external to Counterclaim Plaintiffs' computer, computer system, or computer network.

343.    Biothane and John Murphy have violated California Penal Code § 502(c)(6) by knowingly, fraudulently, and without permission providing, or assisting in providing, a means of accessing Counterclaim Plaintiffs' computers, computer system, and/or computer network.

344.    Biothane and John Murphy have violated California Penal Code § 502(c)(7) by knowingly, fraudulently, and without permission accessing, or causing to be accessed, Counterclaim Plaintiffs' computers, computer system, and/or computer network.

345.    Counterclaim Plaintiffs own the data obtained by Biothane and John Murphy as alleged above.

346.    As a direct and proximate result of Biothane and John Murphy's unlawful conduct within the meaning of California Penal Code § 502, they have caused damage to RCM Digesters in an amount to be proven at trial.  Counterclaim Plaintiffs are also entitled to recover reasonable attorneys' fees pursuant to California Penal Code § 502(e).

347.    Counterclaim Plaintiffs are informed and believe that the aforementioned acts of Biothane and John Murphy were willful and malicious in that Counterclaim Defendants' acts described above were done with the deliberate intent to injure RCM Digesters and Mark Moser's business and improve their own.  Counterclaim Plaintiffs are therefore entitled to punitive damages.

348.    Counterclaim Plaintiffs also have suffered irreparable injury from these acts, and due to the continuing threat of such injury from Counterclaim Defendants' illegal use of the data they obtained in violation of § 502, have no adequate remedy at law, entitling Counterclaim Plaintiffs to injunctive relief.

**COUNT 20**
**Violation of N.J. Stat. Ann. § 2A:38A-1**
**(JOHI, Biothane and Individual Counterclaim Defendants)**

349.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

350.    Biothane and John Murphy's purposeful, knowing, and unauthorized altering, taking and/or destruction of Counterclaim Plaintiffs' data, data base, computer program, or computer software existing internally or externally to a computer, computer system, or computer network, is a violation of N.J. Stat. Ann. § 2A:38A-2(a).

351.    Biothane and John Murphy's purposeful and knowing, and unauthorized accessing or attempt to access Counterclaim Plaintiffs' computer, computer system or computer network, is a violation of N.J. Stat. Ann. § 2A:38A-2(c).

352.    Counterclaim Defendants' purposeful and knowing accessing or obtaining of any of Counterclaim Plaintiffs' data, data base, computer, computer program, computer software, computer equipment, computer system or computer network, is a violation of N.J. Stat. Ann. § 2A:38A-2(e).

353.    Due to Biothane and John Murphy's violations, Counterclaim Plaintiffs are entitled to recover compensatory and punitive damages and the cost of suit, including a reasonable attorney's fee, and costs of investigation and litigation.

354.    Counterclaim Plaintiffs also have suffered irreparable injury from these acts, and due to the continuing threat of such injury from Biothane and John Murphy's illegal use of the data they obtained in violation of § 2A:38A-2, have no adequate remedy at law, entitling Counterclaim Plaintiffs to injunctive relief.

**COUNT 21**
**Unfair Competition - Cal. Bus. & Prof. Code § 17200**
**(JOHI, Biothane and Individual Counterclaim Defendants)**

355.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

356.    Biothane has engaged in unlawful business acts or practices by committing acts including computer fraud, trespass, conversion, interference with business relationships, and other illegal acts and practices as alleged above, all in an effort to gain unfair competitive advantage over Counterclaim Plaintiffs.

357.    These unlawful business acts or practices were committed pursuant to business activity related to providing consulting and design of anaerobic digesters.

358.    The acts and conduct of Biothane constitute fraudulent, unlawful, and unfair competition as defined by California Bus. & Prof. Code §§ 17200, et seq.

359.    Biothane's conduct constitutes violations of numerous state and federal statutes and codes, including, but not limited to, violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq., receipt of stolen property, Cal. Penal Code § 496, unauthorized access to computers, Cal. Penal Code § 502, N.J. Stat. Ann. § 2A:38A-1, and violation of the Stored Communications Act, 18 U.S.C. §§ 2701-11.  Biothane's conduct also constitutes trespass to

chattels, intentional interference with prospective economic advantage, conversion, unjust enrichment, and conspiracy.

360.    Biothane has improperly and unlawfully taken commercial advantage of Counterclaim Plaintiffs' investment in its confidential, proprietary, and copyrighted materials and data.  In light of Biothane's conduct, it would be inequitable to allow it to retain the benefit of the funds obtained though the unauthorized and unlawful use of Counterclaim Plaintiffs' property.

361.    Biothane's unfair business practices have unjustly minimized Counterclaim Plaintiffs' competitive advantage and have caused and are causing Counterclaim Plaintiffs to suffer damages.

362.    As a result of such unfair competition, Counterclaim Plaintiffs have also suffered irreparable injury and, unless Biothane is enjoined from such unfair competition, will continue to suffer irreparable injury, whereby Counterclaim Plaintiffs have no adequate remedy at law.

363.    Biothane should be compelled to disgorge and/or restore any and all revenues, earnings, profits, compensation, and benefits they may have obtained in violation of California Business & Professions Code § 17200 et seq., including, but not limited to, returning the value of the stolen property itself and any revenue earned from it, and should be enjoined from further unlawful, unfair, and deceptive business practices.

364.    Biothane should further be ordered to return all materials taken from Counterclaim Plaintiffs, and all copies of such, in their possession, custody, or control.

## COUNT 22
## Conversion
### (JOHI, Biothane and Individual Counterclaim Defendants)

365.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

366.    Biothane and John Murphy intentionally and willfully entered Counterclaim Plaintiffs' computers without permission and took possession of Counterclaim Plaintiffs' property, including, but not limited to, Counterclaim Plaintiffs' confidential, proprietary, and trade secret materials, all of which Counterclaim Plaintiffs stored on its computer system.

367.    This property is the sole and exclusive property of Counterclaim Plaintiffs. Counterclaim Plaintiffs have an exclusive right to possession and distribution of such property, which is valuable to Counterclaim Plaintiffs and vital to its continued business operations.

368.    Counterclaim Plaintiffs at no time consented, expressly or impliedly, to Biothane and John Murphy's copying, downloading, removal, retention, or distribution of such property.

369.    Biothane and John Murphy have been in knowing and unauthorized possession and control of such property since at least November 2006. On information and belief, since that time, Biothane has been obtaining unjust and substantial benefit from the use, sale, and distribution of Counterclaim Plaintiffs' property without Counterclaim Plaintiffs' consent and without paying Counterclaim Plaintiffs for the value of such property.

370.    Biothane and John Murphy's improper assumption and exercise of dominion and control over Counterclaim Plaintiffs' property and their likely sale and distribution of the same has and will continue to interfere with and diminish Counterclaim Plaintiffs' rights in that property.

371.    Allowing Biothane and John Murphy to retain the benefits received as a result of their wrongful acts would unjustly benefit them at Counterclaim Plaintiffs' expense.

372.    As a direct and proximate result of Biothane and John Murphy's actions, Counterclaim Plaintiffs have lost, and will continue to lose, profits from potential purchasers of Counterclaim Plaintiffs' services in an amount to be determined at trial.

373.    Counterclaim Plaintiffs are entitled to an award of the value of the property taken, with interest, and other damages in an amount to be proven at trial.

374.    In addition, or in the alternative, Counterclaim Plaintiffs are entitled to damages and repossession of the converted property.

375.    In addition, or in the alternative, Counterclaim Plaintiffs are entitled to restitution of the Counterclaim Defendants' ill-gotten gains. Counterclaim Plaintiffs will seek their election of remedies at trial.

**COUNT 23**
**Civil Conspiracy**
(JOHI, Biothane and Individual Counterclaim Defendants)

376.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

377.    Biothane and John Murphy willfully, intentionally, and knowingly agreed and conspired with each other to engage in the alleged wrongful conduct, including their interference with Counterclaim Plaintiffs' business relationships and other unfair business practices, as well as Biothane and John Murphy's computer fraud and conversion of confidential business information.

378.    Biothane and John Murphy did the acts alleged pursuant to, and in furtherance of, that agreement and/or furthered the conspiracy by cooperating, encouraging, ratifying, or adopting the acts of the others.

379.    As a direct and proximate result of the acts in furtherance of the conspiracy, Counterclaim Plaintiffs have suffered injury, damage, loss, and harm, including, but not limited to, loss of profits from sales to current and potential customers of Counterclaim Plaintiffs.  The wrongful conduct committed pursuant to the conspiracy was a substantial factor in causing this harm.

380.    Biothane and John Murphy's intentional agreement to commit, and commission of, these wrongful acts were willful, malicious, oppressive, and in conscious disregard of Counterclaim Plaintiffs' rights, and Counterclaim Plaintiffs are therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

## COUNT 24
### Aiding and Abetting
### (JOHI, Biothane and Individual Counterclaim Defendants)

381.    Counterclaim Plaintiffs repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

382.    As fully described above, Biothane and John Murphy had full knowledge or should have reasonably known of the illegal and tortious nature of the conduct of each other, and aided and abetted such wrongful conduct, including interference with Counterclaim Plaintiffs' business relationships and other unfair business practices, as well as Biothane and John Murphy's fraud and conversion of confidential business information, by providing substantial assistance and/or encouraging the others to act.

383.    Biothane and John Murphy also knowingly aided and abetted the described wrongful conduct of each other by giving substantial assistance and/or encouragement that, separately considered, was wrongful in and of itself.

384.    As a direct and proximate result of the aiding and abetting of these acts, Counterclaim Plaintiffs have suffered injury, damage, loss, and harm, including, but not limited to, loss of profits.  The wrongful conduct aided and abetted by Biothane and John Murphy was a substantial factor in causing this harm.

385.    Biothane and John Murphy's aiding and abetting of these wrongful acts was willful, malicious, oppressive, and in conscious disregard of Counterclaim Plaintiffs' rights, and

Counterclaim Plaintiffs are therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

### DERIVATIVE CLAIMS ON BEHALF OF RCM BIOTHANE
(Counts 25 through 29 are derivative claims brought on behalf of RCM Biothane, LLC)

386.    Mr. Moser has been a member of RCM Biothane LLC since the inception of the company to the present.

387.    Because the other members have sued Mr. Moser, and in light of the other allegations stated herein, any efforts to secure initiation of the action for Counts 25 through 29 alleged herein on behalf of RCM Biothane by the other members and shareholders of RCM Biothane would be futile.

388.    The derivative claims in Counts 25 through 29 to enforce RCM Biothane's rights are not collusive to confer jurisdiction that the Court would otherwise lack.

### COUNT 25
### Breach of Duty of Loyalty and Duty of Care to RCM Biothane, LLC
(JOHI and Individual Counterclaim Defendants)

389.    Counterclaim Plaintiffs and RCM Biothane repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

390.    JOHI and the Individual Counterclaim Defendants breached their duties of care and loyalty to RCM Biothane and the company suffered damage therefrom.

### COUNT 26
### Mismanagement of RCM Biothane, LLC
(JOHI and Individual Counterclaim Defendants)

391.    Counterclaim Plaintiffs and RCM Biothane repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

392.    RCM Biothane was harmed by, and suffered damage from, JOHI and the Individual Counterclaim Defendants' gross mismanagement of RCM Biothane.

## COUNT 27
### Self-Dealing
(JOHI and Individual Counterclaim Defendants)

393.    Counterclaim Plaintiffs and RCM Biothane repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

394.    RCM Biothane was harmed by, and suffered damage from, JOHI and the Individual Counterclaim Defendants' self-dealing.

## COUNT 28
### Usurpation of RCM Biothane LLC Corporate Opportunities
(JOHI and Individual Counterclaim Defendants)

395.    Counterclaim Plaintiffs and RCM Biothane repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

396.    RCM Biothane was harmed by, and suffered damage from, JOHI and the Individual Counterclaim Defendants' usurpation of corporate opportunities.

## COUNT 29
### Corporate Waste of RCM Biothane, LLC
(JOHI and Individual Counterclaim Defendants)

397.    Counterclaim Plaintiffs and RCM Biothane repeat and reallege herein the allegations set forth in the foregoing paragraphs of this Complaint as if each such allegation was fully set forth herein.

398.    RCM Biothane was harmed by, and suffered damage from, JOHI and the Individual Counterclaim Defendants' waste of corporate resources.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Moser, RCM Digesters and RCM Biothane pray for entry of judgment declaring:

    A.    that Biothane Corporation pay to RCM Digesters any and all margins realized on the NBC Mead Project;

    B.    that Biothane Corporation pay to RCM Digesters all amounts received from NBC or other party in connection with warranties provided on the NBC Project;

    C.    that Biothane Corporation pay to RCM Digesters all other amounts owed on the NBC Mead Project or other RCM Projects, including amounts owed for equipment and services;

    D.    that Counterclaim Defendants, their agents, employees, representatives, successors, and assigns and those acting, or purporting to act, in privity or in concert with any Defendant be preliminarily and permanently enjoined from building any digester or other agricultural waste treatment system or conducting any other activity using, or transferring or offering to transfer to any entity, any technology, process, trade secret, know how or other intellectual property transferred from or shared by RCM Digesters or Mark Moser to or with any Counterclaim Defendant or any employee, officer, agent, or representative thereof, and to return or destroy all such information in their custody or control and make all efforts to recover any such information disclosed to any third parties;

    E.    that Counterclaim Defendants pay to RCM Digesters and Mr. Moser amounts to fully compensate them for lost past and future income and all other damages that Counterclaim Defendants' actions caused to their business, including incidental and consequential damages;

    F.    that JOHI pay to Mr. Moser the annual bonuses due to him under the Employment Agreement as required by the conditions of his termination of employment without cause by RCM Biothane;

DMEAST #9920719 v1

59

G.     that JOHI pay to Mr. Moser the annual payments due to him under the Asset Purchase Agreement;

H.     that JOHI pay to Mr. Moser the value of the benefits required to be made available, but not made available, to him under the terms of his Employment Agreement;

I.     that Counterclaim Defendants pay to RCM Digesters the amounts still due to it under the Asset Purchase Agreement for Assumed Contracts as properly calculated according to the formula provided in that Agreement;

J.     that, as equitable compensation to RCM Digesters and Mr. Moser for the unfair and inequitable taking of their trade secrets, technology, processes, and know how, Defendants be barred from involvement in any agriculture waste or other project involving, in any way, the digestion of manure of other animal wastes for a period of at least two years;

K.     that Mr. Moser may carry on business in any field of activity, without restriction;

L.     that Counterclaim Defendants be ordered to transfer ownership, control, and any and all interests in the rcmdigesters.com and rcmbiothane.com domain names to RCM Digesters and/or Mr. Moser, as directed by Mr. Moser in his reasonable discretion;

M.     that Counterclaim Defendants be ordered to each pay punitive damages in the amount of five times actual damages or $350,000 as provided by N.J.S.A. 2A:15-5.9-5.17 to each of Mr. Moser and RCM Digesters, or such other greater amount as allowed by applicable law;

N.     that Mr. Moser and RCM Digesters be granted pre-judgment and post-judgment interest on the damages caused to it by reason of Counterclaim Defendants' actions;

O.     that Counterclaim Defendants pay to Mr. Moser and RCM Digesters their attorneys' fees;

P.     that costs and interest be awarded to Mr. Moser and RCM Digesters; and

Q.     that the record of trial or other proceedings resolving this matter be referred to the prosecutor of the county in which the matter is tried and to the Attorney General pursuant to N.J.S.A. 2A:15-5.17 for investigation of whether a criminal act has been committed; and

R.     that Counterclaim Defendants, their officers, agents, servants, employees, and attorneys, and those in active concert or participation with any of them are preliminarily and permanently enjoined  from:

(1)     accessing any of the computer files of RCM Digesters and Mark Moser;

(2)     selling, distributing, or using any data, information or know-how obtained from such files, including without limitation, Counterclaim Plaintiffs' confidential, proprietary, and trade secret materials; and

(3)     otherwise engaging in acts of unfair competition and interference with the business relationships of Mr. Moser and  RCM Digesters;

S.     that Counterclaim Defendants file with the Court and serve on Mr. Moser and RCM Digesters within thirty (30) days after the service on Defendants of such injunction a report in writing, under oath, setting forth in detail the manner and form in which Counterclaim Defendants have complied with the injunction;

T.     that Counterclaim Defendants return the property of Mr. Moser and RCM Digesters, including, without limitation, their confidential and proprietary files, as set forth in this Amended Counterclaim;

U.     that the Court order Counterclaim Defendants to pay to Mr. Moser and RCM Digesters punitive damages in a sum to be determined at trial, on the basis of their willful and deliberate unauthorized computer access, intentional interference with Counterclaim Plaintiffs' prospective economic advantage, aiding and abetting and conspiracy;

V.  that Counterclaim Defendants pay to Mr. Moser and RCM Digesters all ill-gotten gains unjustly obtained and retained by Counterclaim Defendants through the acts complained of here;

W.  that Counterclaim Defendants provide an accounting;

X.  that Mr. Moser and RCM Digesters be granted such other and further relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

RCM Digesters and Mr. Moser hereby demand a trial by jury.

Respectfully submitted,
RCM DIGESTERS, INC.
and MARK A. MOSER,
By Their Attorneys:

March 31, 2008

Joseph H. Kenney
William J. DeSantis
Plaza 1000 - Suite 500
Main Street
Voorhees, NJ  08043-4636

(by *Pro Hac Vice*)
James C. Duda
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, MA 01115
(413) 781-2820

<u>VERIFICATION</u>

Mark Moser, of full age, upon his Certification, says:

1.    I am the founder and President of RCM Digesters, Inc.

2.    I have read the foregoing Verified First Amended Counterclaim, and I hereby certify
      that the factual allegations contained in the foregoing paragraphs, except for any
      paragraphs based on information and belief, are true and correct.  I am aware that if
      any of the foregoing statements made by me are willfully false, I am subject to
      punishment.

                                                  _____
                                                  Mark Moser

DATED: March _28_, 2008