IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JOSEPH OAT HOLDINGS, INC.,
BIOTHANE CORPORATION, ROBERT
SAX, MICHAEL HOLTZ, GRAIG
ROSENBERGER, MARTIN KAPLAN,
RONALD KAPLAN, JOHN MURPHY,
AND RCM BIOTHANE, LLC,
      Plaintiffs,
     v.
RCM DIGESTERS, INC. AND MARK
MOSER,
Defendants/ Counterclaimants/
Third-Party Plaintiffs.

CIVIL NO. 06-4449(NLH)(JS)

**OPINION**

**APPEARANCES:**
Richard J. Kravitz, Esquire
Mukti Naresh Patel, Esquire
Patricia C. McManus, Esquire
Fox Rothschild, LLP
Princeton Pike Corporate Center, Building 3
997 Lenox Drive
Lawrenceville, NJ 08648-2311
    *Attorneys for Plaintiffs*

William J. DeSantis, Esquire
Joseph Kenney, Esquire
Ballad Spahr Andrews & Ingersoll, LLP
Plaza 1000 - Main Street
Suite 500
Voorhees, NJ 08043

James C. Duda, Esquire
Eric D. Beal, Esquire
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, MA 01115
    *Attorneys for Defendants/Counterclaimants/Third-Party*
    *Plaintiffs*

**HILLMAN**, District Judge

    Plaintiffs Joseph Oat Holdings, Inc. ("JOHI"), Biothane

Corporation ("Biothane"), Robert Sax, Michael Holtz, Graig

Rosenberger, Martin Kaplan, Ronald Kaplan, John Murphy[1], and RCM Biothane[2] filed a Verified Complaint consisting of eight claims against Defendants RCM Digesters, Inc. ("RCM Digesters") and Mark Moser.  Defendants filed an answer, a verified counterclaim consisting of 29 counts, and a third-party complaint[3] consisting of two counts.  Plaintiffs have moved to dismiss and/or for summary judgment on ten counts in defendants' counterclaim and both counts of the third-party complaint.  Defendants have opposed the motion. For the reasons expressed below, plaintiffs' motion is denied.

## I.  BACKGROUND

Moser was the founding stockholder of RCM Digesters, a business that promoted, designed, built, and sold anaerobic digester systems.[4]  Contemporaneously, Biothane existed as a multinational corporation specializing in the biological treatment of industrial wastewaters.  On August 23, 2004, Biothane and RCM Digesters entered into a confidentiality agreement ("the

---

[1] Robert Sax, Michael Holtz, Graig Rosenberger, Martin Kaplan, Ronald Kaplan, and John Murphy are collectively referred to as the "individual plaintiffs."

[2] RCM Biothane is a nominal plaintiff, i.e., one who is named as a plaintiff in an action, but who has no interest in it, having assigned the cause or right of action to another.

[3] The third-party complaint is asserted against JOHI; the counterclaims are asserted against JOHI, Biothane and/or the individual defendants.

[4] Anaerobic digestion systems are vessels containing bacteria that break down organic wastes, such as manure, without air, and produce methane as a byproduct.

2

Confidentiality Agreement") that "govern[ed] the conditions of disclosure by RCM [Digesters] to [Biothane] of any confidential information...relating to the contracts, business or technology of RCM [Digesters]."  Subsequently, as a result of a series of agreements between the parties, Biothane's principals and Moser (who was RCM Digesters' principal) created RCM Biothane.

RCM Biothane was formed pursuant to a Certificate of Formation dated February 17, 2005 ("the Certificate of Formation").  On the same date, RCM Biothane entered into a license agreement with Biothane ("the License Agreement"), signed by Biothane and RCM Biothane, to use the federally registered trademark Biothane(R)[5] as part of the name under which it traded.

Four additional agreements were executed on April 21, 2005: (1) a purchase agreement ("the Asset Purchase Agreement"), which was signed by RCM Digesters, Moser, and RCM Biothane, and under which RCM Biothane purchased "substantially all of the assets (real, personal or mixed, tangible or intangible) and business" of RCM Digesters; (2) an employment agreement ("the Employment Agreement"), signed by RCM Biothane and Moser, which designated Moser as the "Managing Director" of RCM Biothane; (3) a restrictive covenant agreement (the "Restrictive Covenant Agreement"), signed by Moser, that governed the parties post-employment obligations;

---

[5] Biothane's Certificate of Registration for federal trademark number 1170077 is dated September 21, 1981, and was renewed on December 11, 2002.

and (4) a Limited Liability Company agreement ("the Operating Agreement"), which was signed by RCM Biothane and JOHI, and under which JOHI was to own 80% of RCM Biothane, and Moser was to own 20%.[6]

Due to what plaintiffs call a "stormy relationship," the parties agreed to terminate the operation of RCM Biothane.  On August 7, 2006, the parties entered into a separation agreement (the "Separation Agreement"), which was signed by the six individual plaintiffs and Moser.  Plaintiffs contend that the Separation Agreement constitutes a settlement between the parties, and that all other previous agreements were made "null and void" by the Separation Agreement.  In their complaint, plaintiffs seek a declaration that the Separation Agreement is a valid and enforceable contract, and allege, *inter alia*, that defendants have breached the Separation Agreement.  Defendants counter, however, that the Separation Agreement was not a "settlement agreement" as it is called by plaintiffs, that it does not represent a final dissolution of the parties' business relationship, and that Moser's signing of the document was induced by fraud.  Correspondingly,

---

[6] The Operating Agreement provided that JOHI could designate up to six of the members of the Board of Managers ("the BOM"), each with one vote, and that Moser would have one vote.  The six members of the BOM that JOHI designated were Martin Kaplan, John Murphy, Graig Rosenberger, Ronald Kaplan, Michael Holtz, Robert Sax, and non-voting member Denise Roberts (who is not a party in this case).  JOHI claims to own all of the outstanding capital stock of Biothane.

4

defendants contend that the Separation Agreement does not vitiate the previous agreements, and defendants have asserted claims based on fraudulent activity regarding those agreements as well.

Even though the parties have asserted numerous other claims against each other, and plaintiffs are also moving for judgment on defendants' claims of breach of fiduciary duty, unjust enrichment, libel, and intention infliction of emotional distress, the Separation Agreement is the main issue in plaintiffs' instant motion for summary judgment.  Further, even though the parties have subsequently filed several additional motions for partial summary judgment, the validity of the Separation Agreement is also the main issue in the case--answering the question of whether the Separation Agreement serves as the final resolution of the parties' business relationship and voids all previous agreements also answers many of the parties' other claims.  Accordingly, because the validity of the Separation Agreement affects all aspects of the case, the Court will address the issues briefed in the current motion rather than waiting to resolve all partial summary judgment motions at one time.[7]

_____

[7]The Court notes that discovery has not been completed, and instead of each filing one motion for summary judgment as to all claims at the end of the discovery period, the parties have filed this, and subsequent, voluminous motions for partial summary judgment on other counts in each others' complaint/counterclaim. (See Docket No. 80, 170, 180, 181).  As found by Judge Kugler in a case where the parties filed six partial motions for summary judgment, this is effectively in violation of the page limits prescribed by the Local Rules.  See Securimetrics v. Iridian

## II. DISCUSSION

**A.   Jurisdiction**

This Court has jurisdiction over the federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

**B.   Summary Judgment Standard[8]**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's

───────────────

Technologies, Civ. No. 03-4394, Docket No. 229 (Feb. 24, 2006) (because the parties filed separate motions rather than one motion for summary judgment addressing all counterclaims and defenses within the page limits prescribed by the Local Rules, dismissing without prejudice all motions and ordering the filing of a single motion within the page limits); Local Civil Rule 7.2(b) (moving brief and opposition no longer than 40 pages; reply no longer than 15 pages).  This Court will not take the same path, as it is recognized that there are over 40 counts to be disposed of, and the parties represent that this piecemeal approach is intended to get to the true heart of the matter.  The Court, however, admonishes the parties to adhere to the Rules regarding page limits and sur-replies.

[8]Plaintiffs have moved to dismiss defendants' claims, or in the alternative, for summary judgment.  Because the Court is considering matters outside the pleadings, only the summary judgment standard is applicable.  See Fed. R. Civ. P. 12(b).

favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
A fact is "material" if, under the governing substantive law, a
dispute about the fact might affect the outcome of the suit.  Id.
In considering a motion for summary judgment, a district court may
not make credibility determinations or engage in any weighing of
the evidence; instead, the non-moving party's evidence "is to be
believed and all justifiable inferences are to be drawn in his
favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d
Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating
the absence of a genuine issue of material fact.  Celotex Corp. v.
Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met
this burden, the nonmoving party must identify, by affidavits or
otherwise, specific facts showing that there is a genuine issue for
trial.  Id.  Thus, to withstand a properly supported motion for
summary judgment, the nonmoving party must identify specific facts
and affirmative evidence that contradict those offered by the
moving party.  Anderson, 477 U.S. at 256-57.  A party opposing
summary judgment must do more than just rest upon mere allegations,
general denials, or vague statements.  Saldana v. Kmart Corp., 260
F.3d 228, 232 (3d Cir. 2001).

7

**C.    Analysis**

**1.    Validity and effect of the Separation Agreement**

In their brief, plaintiffs tell the story of sophisticated and experienced businessmen whose business relationship failed, as many do, and the dissolution of that business relationship.  Plaintiffs relate that when the parties met on August 7, 2006 to terminate the operation of RCM Biothane, they, over the course of "five to eight hours," meticulously addressed the dissolution, and they came to an agreement as to the settlement of all outstanding matters. Plaintiffs represent that the Separation Agreement is a written contract memorializing the parties' discussions, and on its face, the contract clearly sets forth the parties' respective duties, as well as its effect on previous agreements.

Specifically, plaintiffs argue that Moser participated in the meeting and willingly, without any duress, signed the Separation Agreement along with the individual plaintiffs.  Plaintiffs also argue that the plain language of the contract is clear, in that it makes "null and void" the Asset Purchase Agreement between RCM Digesters and RCM Biothane, and that all other agreements between the parties are superceded by the Separation Agreement.  The Separation Agreement then sets forth in bullet points their obligations.  Based on the plain language of the document alone, and supported by Moser's testimony and other evidence in the record, plaintiffs argue that there is no dispute of material fact

as to the validity of the agreement or of defendants' breach of the
obligations under the agreement.  Furthermore, plaintiffs argue
that there is no dispute that defendants have ratified the contract
by accepting its benefits, while at the same time failing to
perform its obligations, and, consequently, they cannot now argue
that the Separation Agreement is invalid.  Therefore, they contend
that they are entitled to summary judgment on defendants'
counterclaims of fraud, breach of contract, and other related
claims arising from the Separation Agreement, as well the other
agreements, since they were voided by the Separation Agreement.

Defendants tell a completely different story.  They contend
that from the inception of their business relationship, Moser was
defrauded and taken advantage of by plaintiffs.  As defendants
relate in their brief, "After more than a year of lying to Mr.
Moser, fraudulently inducing him to sell his company's assets,
violating the terms of the agreements by which those assets were
transferred, withholding money that they clearly owed to Mr. Moser
in an attempt to blackmail him to transfer his proprietary
technology, and stealing that technology along with the most
significant project and client Mr. Moser had ever secured,
Plaintiffs then fraudulently induced Mr. Moser to sign a vaguely
worded document entitled 'Separation Agreement' that Plaintiffs
seek to have interpreted in a manner that would utterly destroy Mr.
Moser financially if not personally."  (Def. Opp. Br. at 1.)

Defendants argue that the Separation Agreement was not meant to be a final resolution of the dissolution of the business, and concomitantly, many of the terms in the document were incorrect due to plaintiffs' errors and manipulations.  Furthermore, defendants argue that even if the Separation Agreement were a valid contract, plaintiffs have not abided by its terms.

At the outset, the Court notes that plaintiffs are seeking summary judgment on defendants' counterclaims by effectively obtaining a judgment as to their declaratory judgment count. Plaintiffs argue that because defendants took over RCM Biothane's "business and assets, lock, stock, and barrel, pursuant to the Separation Agreement, this Court should not allow defendants to allege that agreement's invalidity." (Pl. Br. at 2.)  The validity of the Separation Agreement, however, is plaintiffs' burden to prove.  Thus, it must be determined whether plaintiffs have met their burden of proof to support their claim.[9]

---

[9]Defendants have also asserted a counterclaim for breach of contract with regard to the Separation Agreement, which presumes the validity of the contract.  Plaintiffs argue that defendants are precluded from both asserting fraud and breach of contract because they are inconsistent--defendants cannot claim the agreement's invalidity and its benefits simultaneously--and violative of the doctrine of election of remedies and/or are barred by judicial estoppel and waiver.  Defendants counter that they have simply pleaded claims in the alternative as they are permitted to do under the Rules of Civil Procedure.

Because the Court finds that issues of material fact exist as to the validity of the contract, plaintiffs' argument is premature.  First, there is a disputed issue of fact as to whether Moser accepted the benefits of contract as plaintiffs claim.  Second, before the doctrines of election of remedies,

The Court finds that material issues of disputed fact remain as to the validity of the Separation Agreement.[10]  Material issues include[11]:

1.   *Whether the Separation Agreement was meant to be the last and final word on the dissolution of the business relationship.*

Even though, as plaintiffs point out, parties create an enforceable contract "when they agree on its essential terms and manifest an intent that the terms bind them," Baer v. Chase, 392 F.3d 609, 619 (3d Cir. 2004), and neither party disputes that they wanted to dissolve the business relationship and execute a writing to memorialize all the attendant details, it is disputed whether the Separation Agreement is that writing.

---

judicial estoppel and waiver are to be considered, it must be determined by a fact finder whether the contract is valid--on its face and/or ratified by Moser's conduct.  If the fact finder finds the Separation Agreement to be valid, defendants' fraud argument will have been rejected; thus, the fact finder will then have to determine how both parties performed under the contract-- i.e., whether either side breached.  If, however, the fact finder finds that the Separation Agreement is not valid, the fact finder would have considered whether it is invalid because of plaintiffs' fraud as defendants claim.  At this stage, defendants' alternative positions are permissible and reconcilable.

[10]Pursuant to the Court's August 24, 2007 Opinion, the issue of the validity of the Separation Agreement is one that must be decided by a jury.

[11]There are numerous other areas of dispute raised in the parties' lengthy and detailed briefing.  Because the issues of fact set forth below are sufficient to defeat summary judgment, the Court need not specifically address the other areas of dispute, other than to note those disputed issues also support the denial of summary judgment.

Plaintiffs argue that all material terms are included in the agreement, and even if non-material issues--such as final figures and insurance--were not fully addressed by the agreement, the agreement is still a valid, enforceable contract.  In contrast, defendants argue that the parties understood that the agreement was not the final word on the matter, and the final figures and insurance, among others, were not "non-material" issues.  Indeed, the Separation Agreement states, "All figures are subject to final review by Moser and Biothane," and defendants have presented evidence that the financial figures are still in dispute.[12]  This language alone could be construed to support Moser's contention that he signed the document with the understanding that they would meet again to continue discussion on the separation, and that he never would have signed the agreement unless he had another opportunity to review the financial figures and terms.  Further, seven days later, on August 14, 2006, Moser sent an email to plaintiffs claiming that the "admittedly false inducement of [individual plaintiffs] voids any agreement," and Moser's attorney

---

[12]Plaintiffs argue that because Moser was in control of RCM Biothane's books, if the financial figures were incorrect, that was his doing.  Defendants argue that plaintiffs manipulated the company books.  The accuracy of the financial figures is, thus, another factual dispute.

Further, the Court notes that defendants have only recently presented evidence regarding the analysis of the business's finances because expert discovery is still ongoing.  (See Docket No. 182, March 18, 2009.)  This demonstrates why the filing of summary judgment motions prior to the end of discovery is disfavored.

advised him that the Separation Agreement was invalid.

Although to be valid, a contract does not have to "exactly spell[] out" each term, see Lo Bosco v. Kure Eng'g Ltd., 891 F. Supp. 1020, 1025 (D.N.J. 1995), plaintiffs have not demonstrated an absence of material fact as to whether the Separation Agreement was complete enough to constitute a binding agreement.[13]  It is undisputed that the parties wanted to sever relations, but it is disputed whether this document was intended to be the complete written manifestation of all the parties' obligations.  See Interstate Realty Management Co. v. Community Realty Management, Inc., 2009 WL 77967, *9 (N.J. Super. Ct. App. Div. Jan. 14, 2009) (citing In re Estate of Miller, 90 N.J. 210, 221, 447 A.2d 549 (1982) (restating "the well-known principle that an ambiguous contract is generally to be construed against its drafter"); Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992)(quoting West Caldwell v. Caldwell, 26 N.J. 9, 24-25 (1958)) ("A contract 'arises from offer and acceptance, and must be sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty.'"); Insurance Co. of State

---

[13]The parties also dispute the understanding of the phrases "null and void" and "holds the other harmless."  Whether a contract term is clear or ambiguous is a matter of law to be decided by the Court, see Assisted Living Assoc. of Moorestown v. Moorestown Twp., 31 F. Supp. 2d 389, 397 (D.N.J. 1998) (citing New Jersey state cases); however, the Court will not undertake such analysis until the validity of the entire agreement has been determined.

13

of Pennsylvania v. Don Siegel Const., Inc., 2006 WL 1667175, *2-3 (N.J. Super. Ct. App. Div. 2006) (quoting DeVries v. The Evening Journal Ass'n, 9 N.J. 117, 119-20 (1952)) ("As summarized by our Supreme Court over fifty years ago: 'It is fundamental that the essential element to the valid consummation of a contract is a meeting of the minds of the contracting parties and that until there is such a meeting of the minds either party may withdraw and end all negotiations.... So long as negotiations are pending over matters relating to the contract, and which the parties regard as material to it, and until they are settled and their minds met upon them, it is not a contract, although as to some matters they may be agreed.'"); cf. McMillan v. State Mutual Life Assurance Co. of Am., 922 F.2d 1073, 1074 (3d Cir. 1990) ("Where the facts of performance are not in dispute and the terms of the . . . contract are unambiguous, determining the meaning and legal effect of the contract is a question of law that is an appropriate matter for resolution on summary judgment.")

Consequently, disputed issues of material fact remain as to whether the Separation Agreement was meant to be the last and final word on the dissolution of the business relationship.

2. *Whether Moser was fraudulently induced into signing the Separation Agreement.*

A major factual dispute centers on the events leading up to the August 7, 2006 meeting, and what occurred at the meeting.

14

Moser provides a detailed account of plaintiffs' alleged clandestine efforts to steal his major client and his proprietary technology.  He also claims that he was asked to the August 7, 2006 meeting under false pretenses.  He agrees that he wanted to end his business relationship with plaintiffs, but contends that plaintiffs came prepared for the meeting, while Moser was blindsided.  He further contends that he was strong-armed into signing the Separation Agreement at the end of the day.  As noted above, he claims he signed the document with the understanding it was not final, and only later came to find out about plaintiffs' alleged successful efforts to steal his client and technology, which is evidenced by his August 14, 2006 email, among other things.

Plaintiffs, however, argue that Moser had ample time to contemplate the agreement; he never consulted an attorney prior to signing, even though he is a sophisticated business man and knew he could have done so; he checked with his bookkeeper about financial issues; and he testified at his deposition that other than a second review of the financial terms, he did not know of any statements in the document that turned out to be false.  Thus, plaintiffs argue that Moser was not only not fraudulently induced into signing the contract, he did so willingly and with open eyes.

As the above summary of the parties' arguments show, plaintiffs have not demonstrated an absence of material fact with regard to defendants' claims of fraud to warrant summary judgment

15

in their favor.  Even though much of defendants' claims rest on the testimony of Moser, the Court is not permitted to evaluate Moser's credibility.[14]  Further, the Court again notes that when plaintiffs filed the instant motion, discovery was not complete, and it is still not complete today.  Certain information that has been subsequently gathered during expert discovery provides evidence to support Moser's claim that the financial data about RCM Biothane's value was incorrect on the day Moser signed the Separation Agreement.  (Docket No. 182.)  Even though plaintiffs may dispute defendants' expert, it demonstrates, at this time, another disputed issue of fact regarding defendants' fraudulent inducement claim.

---

[14]Plaintiffs argue that disparity exists between Moser's deposition testimony and the affidavit he provides in support of his opposition to plaintiffs' motion.  Plaintiffs invoke the "sham affidavit rule," which "refers to the trial courts' practice of disregarding an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony." In re CitX Corp., Inc., 448 F.3d 672, 679 (3d Cir. 2006) (citation omitted).  Specifically, plaintiffs argue that because Moser testified that the business was transferred pursuant to the Separation Agreement, he cannot then claim in his affidavit that it was not transferred pursuant to that agreement.

The Court finds that the issue is not as black and white as suggested by plaintiffs.  Moser states that after the August 7, 2006 meeting, he operated as if the Separation Agreement was a work-in-progress, but that he agreed that the two companies were to be disengaging.  The fact that he transferred the business pursuant to the agreement does not per se mean that he considered the agreement to be a final resolution of the parties' business divorce.  This a disputed issue for a jury to resolve.

3.    *Whether Moser availed himself of the benefits of the contract or otherwise performed under the contract, and, therefore, ratified the contract.*

The biggest point of contention, and a primary basis for plaintiffs' claim that the Separation Agreement is a valid contract, is Moser's conduct after the August 7, 2006 meeting. Plaintiffs argue that Moser acted as if the contract was valid, because he performed some of his obligations under the agreement and availed himself of all its benefits.  First, plaintiffs present Moser's deposition testimony, where he stated that the Separation Agreement was the basis for transferring all the assets, computer, and furniture back to RCM Digesters.  Plaintiffs also present that pursuant to the Separation Agreement, Moser transferred all RCM Biothane customers to RCM Digesters, as well as the employees, and even assumed the lease.  Plaintiffs also argue that defendants misappropriated the RCM Biothane accounts, drained them, and then set up new accounts in the name of a new legal entity to deposit accounts receivable that were assigned to plaintiffs.  Further, plaintiffs argue that because defendants have filed a counterclaim that plaintiffs illegally copied data off a computer that defendants claim was transferred to them under the Separation Agreement, it demonstrates that defendants were acting under the Separation Agreement.  Finally, because the Separation Agreement permitted defendants to retain the $350,000 previously paid to defendants under the Asset Purchase Agreement, and defendants did

17

not return the money, plaintiffs claim that this also shows that
they were acting as if the Separation Agreement were valid.

Defendants dispute plaintiffs' interpretation of Moser's
testimony, and argue that it is blatantly false that Moser acted in
any way pursuant to the Separation Agreement.  Rather, defendants
argue that he attempted to operate RCM Biothane while the parties
negotiated a valid agreement to control the dissolution.[15]  Further,
with regard to the computer files, defendants argue that plaintiffs
affirmatively and secretly invaded defendants' computer file
servers and copied and took virtually all of defendants' files
located on the servers.  Defendants contend that this action does
not demonstrate that defendants acted in accordance with the
Separation Agreement.[16]

As stated above, the one undisputed fact is that the parties
wanted a business divorce, and on August 7, 2006 they discussed the
details of that divorce.  The fact that Moser still continued to
operate RCM Biothane after August 7, 2006, despite the language in
the Separation Agreement that "RCM Biothane is dissolved,"
demonstrates that in practical effect, even if the Separation

---

[15]Moser stopped operating RCM Biothane pursuant to this
Court's September 29, 2006 Order preliminary enjoining defendants
from operating RCM Biothane.  He then claims he serviced
customers as RCM Digesters.

[16]Defendants have filed a motion for partial summary
judgment on their claims related to the computer files.  (See
Docket No. 181.)  That motion has not been fully briefed and is
currently pending.

18

Agreement were valid, time was necessary to wind down the affairs
of RCM Biothane.  Further, Moser was ordered by this Court to cease
operating as RCM Biothane.  When he transferred all assets,
computers, and furniture back to RCM Digesters, his conduct could
be construed as either complying with the Court order, following
the Separation Agreement while considering it valid, following the
Separation Agreement as a work-in-progress, or combination of
different reasons.  What is clear is that there are numerous
disputed issues of material fact regarding the Separation
Agreement, and accordingly, summary judgment in plaintiffs' favor
cannot be entered as to the validity of the agreement.
Consequently, plaintiffs' motion with regard to Counts 1, 2, 4, 6,
7, 10, and 11 in defendants' counterclaim is denied.

> ## 2. Plaintiffs' motion for summary judgment on defendants' counterclaims of Breach of Fiduciary Duty (Count 6), Unjust Enrichment (Count 13), Libel (Count 14), and Intentional Infliction of Emotional Distress (Count 15)[17]

Plaintiffs have also moved for summary judgment on four
additional counterclaims.

> ### a. *Breach of Fiduciary Duty*

Plaintiffs argue that defendants' counterclaim for breach of
fiduciary duty is a claim that belongs only to RCM Biothane, it can
only be brought as a derivative claim, it is not assignable to

---

[17]Pursuant to the Court's August 24, 2007 Opinion, these
four counts in defendants' counterclaim are ones that will be
submitted to a jury.

defendants, it is inconsistent with the Separation Agreement because RCM Biothane was dissolved, and Moser has no standing to assert this claim directly.

Defendants argue that in Count 6, Moser alleges that by abusing their dominant position over him, JOHI and the individual plaintiffs/counterclaimant defendants breached their fiduciary duties to Moser.  In Count 25, defendants claim that plaintiffs breached their duties of loyalty and care to RCM Biothane.[18]  Defendants argue that both claims are viable.

It is black letter law that shareholders are not permitted to assert claims that belong to the corporation--only the corporation, either directly or derivatively, can assert its claims. In re Kaplan, 143 F.3d 807, 812 (3d Cir. 1998).  This rule, however, does not bar a shareholder's claim if he seeks to recover for injuries that were inflicted on him individually rather than on the corporation. Id. (citing Kroblin Refrigerated Xpress, Inc. v. Pitterich, 805 F.2d 96, 104 (3d Cir. 1986)); Davis v. U.S. Gypsum Co., 451 F.2d 659, 662 (3d Cir. 1971) ("It is hornbook law that claims asserted for the benefit of stockholders qua stockholders in a corporation because of the tortious acts of its officers or those actions in conjunction with them is a class suit, a derivative action, and recovery is for the benefit of the corporation directly and indirectly to its stockholders. It is equally clear that where

---

[18]Plaintiffs have not moved for judgment on Count 25.

a corporation, tortiously conspires with others to damage an individual and does so a cause of action arises which belongs to the individual.").

Further, particularly in a closely held corporation, majority shareholders have a fiduciary duty to minority shareholders. Roll v. Singh, 2008 WL 3413863, *7 (D.N.J. 2008) (finding that there was a fiduciary duty between the majority shareholder and the minority shareholder, thus creating a duty to disclose material information) (citing Davis, 451 F.2d at 662 (holding that a minority shareholder has standing to bring a direct cause of action against a majority shareholder for breach of a fiduciary duty); Small v. Goldman, 637 F. Supp. 1030, 1033 (D.N.J. 1986) (holding that a majority shareholder owes a fiduciary duty directly to the minority shareholders, and a shareholder may sue for the harm inflicted upon the corporation where there exists a special relationship between the suing shareholder and the defendant, creating a duty, contractual or otherwise, other than that owed to the corporation)).

Here, Moser has claimed that the individual plaintiffs breached their fiduciary to him as a fellow shareholder by their fraudulent activity.  Because there are issues of disputed fact with regard to that alleged fraudulent activity, and those allegations directly speak to Moser's claim of breach of fiduciary duty, summary judgment must be denied.

21

### b.  *Unjust Enrichment*

Plaintiffs argue that they are entitled to judgment on defendants' unjust enrichment claim because a party cannot maintain an unjust enrichment claim when a valid contract governs the rights of the parties.  Although it is true that the equitable remedy of unjust enrichment is not available when there is a valid contract, Van Orman v. American Ins. Co., 680 F.2d 301, 310 (3d Cir. 1982), here, it is still disputed whether a valid contract--the Separation Agreement--exists.  Consequently, judgment cannot be entered in plaintiffs' favor on this claim at this time.

### c.  *Libel*

Moser claims that JOHI and the individual defendant John Murphy libeled him when Murphy sent a memorandum on October 24, 2006 to all current and past RCM Biothane employees.[19]  Moser claims that the memo contained false statements about his compliance with contractual obligations, obligations to his employees, and compliance with the Court's preliminary injunction order.  Moser claims the memo was intentionally sent to harm his reputation. Plaintiffs argue that they are entitled to summary judgment on this

---

[19]In defendants brief, they claim that plaintiffs published other defamatory statements about Moser.  Because these other statements are not the basis for defendants' libel claim against plaintiffs, and because a party cannot amend his complaint through briefing, Bell v. City of Philadelphia, 275 Fed. Appx. 157, 160 (3d Cir. 2008), the Court will not consider those other statements.

claim because the statements were not false, they were not

defamatory, and they are otherwise protected by the litigation

privilege.

   The October 24, 2006 memo from John Murphy reads,

> As you are undoubtedly aware, pursuant to a
> Separation Agreement that was entered into by Mark Moser
> and the remaining members of RCM Biothane LLC and its
> managers, RCM Biothane LLC was dissolved effective August
> 7, 2006.  Mr. Moser assumed all of RCM Biothane's
> obligations and also agreed to reestablish his business,
> RCM Digesters, which should have employed you and
> commenced performing under any existing contracts that
> may have been in the name of RCM Biothane.  Because it
> appears that Mr. Moser has not complied with the
> Separation Agreement and has not transferred your
> employment to RCM Digesters, we are constrained to advise
> you that, pursuant to the Separation Agreement, you have
> not been employed by RCM Biothane since August 7, 2006.
> Accordingly, you should look to Mr. Moser for any
> compensation due to you.  The fact that Mr. Moser has
> used RCM Biothane checks, without our approval, to pay
> you does not change the fact that you have not been
> employed by RCM Biothane since August 7, 2006.
>
> Please immediately advise us if you become aware of
> the violations of the Preliminary Injunction, such as
> your receipt of checks drawn on a RCM Biothane LLC
> account.

(Def. Ex. X.)

   It must be noted that plaintiffs cite New Jersey law, but

defendants rely on California law because Murphy created the memo

in California.  The Court need not undertake a choice of law

analysis at this time, however, because summary judgment must be

denied under either standard.

The basic elements for a defamation[20] claim are essentially the same in both states.  In California, the tort of defamation "involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage."  Ringler Associates Inc. v. Maryland Cas. Co.,  80 Cal. App. 4th 1165, 1179-1180, 96 Cal. Rptr. 2d 136, 148 (Cal. App. 1 Dist. 2000)).  To state a defamation claim under New Jersey law, a defendant must make a false and defamatory statement of fact about plaintiff, that the defendant knew or should have known was false, and that was communicated to third parties, causing damages.  Artista Records, Inc. v. Flea World, Inc., 356 F. Supp. 2d 411, 424 (D.N.J. 2005) (citing Beck v. Tribert, 711 A.2d 951, 953-59 (N.J. Super. Ct. App. Div. 1998)).

What constitutes defamation, and who must decide whether a statement is defaming, is also similar in both states.  In California,

> If a statement of opinion implies a knowledge of facts
> which may lead to a defamatory conclusion, the implied
> facts must themselves be true. Even if the publisher of
> the opinion states the facts upon which he or she bases
> this opinion, if those facts are either incorrect or
> incomplete, or if the person's assessment of them is
> erroneous, the statement of opinion may still imply a
> false assertion of fact. Simply couching such statements
> in terms of opinion does not dispel these implications,
> and such statements may be actionable. In such a case,
> the dispositive question is whether a reasonable

---

[20]Printed defamation is libel.  Restatement (Second) of Torts § 568 (1976).

factfinder could conclude the published statements imply
an assertion of defamatory fact. If so, the defendant
must prove the fact is true.

Ringler, 80 Cal. App.4th at 1181 (also explaining that truth is a

defense to defamation).

    In New Jersey,

    A defamatory statement is one that is false and injurious
    to the reputation of another or exposes another person
    to hatred, contempt or ridicule or subjects another person
    to a loss of the good will and confidence of others.  A
    court must look to the fair and natural meaning which
    will be given it by reasonable persons of ordinary
    intelligence and examine the publication as a whole and
    in context.  A court may determine as a matter of law
    whether a statement is defamatory, assuming that it is
    capable of only one meaning. When the words are capable
    of either a defamatory or non-defamatory construction,
    however, the trier of fact must determine their meaning.

 Taj Mahal Travel, Inc. v. Delta Airlines, Inc., 164 F.3d 186, 189

(3d Cir. 1998) (citing New Jersey cases); see also Artista Records,

Inc. v. Flea World, Inc., 356 F. Supp. 2d 411, 425 (D.N.J. 2005)

(stating that truth is a complete defense to a claim of

defamation).

    Here, summary judgment must be denied because whether Murphy's

memo stated false information, and was therefore defamatory, is

disputable.  Murphy's memo presents as a fact that the Separation

Agreement was effective and valid as of August 7, 2006.  Based on

that premise, Murphy concludes that Moser breached the Separation

Agreement, and was operating in violation of it by issuing RCM

Biothane checks to employees.  These statement may not be

considered false if it is determined that the Separation Agreement was indeed valid as of August 7, 2006 and that Moser did breach the agreement by his conduct thereafter.  If, however, the opposite conclusion is made, then Murphy's statements could be construed as false, and thus, defamatory if the other elements of a libel claim are met.  Consequently, plaintiffs are not entitled to judgment in their favor on this claim at this time.[21]

> ### d.   *Intentional Infliction of Emotional Distress*

Moser has asserted a claim that plaintiffs' conduct during

---

[21]To the extent that plaintiffs argue that the memo is protected by the litigation privilege, it fails.  Under New Jersey law, there is absolute immunity from tort liability for a communication if: (1) the statement is made in connection with a judicial or quasi-judicial proceeding; (2) by litigants, counsel or other participants authorized by law; (3) to achieve the objects, including pre-trial preparation, of a litigation; and (4) it has some connection or logical relation to the action.  Peterson v. Ballard, 679 A.2d 657, 663-64 (N.J. Super. App. Div. 1996) (stating that whether a defendant is entitled to the privilege in a particular case is a question of law).  The privilege "is premised upon the belief that the public interest in having free access to judicial and quasi-judicial bodies without being restrained by the possibility of an ensuing law suit for damages is paramount to the public policy that an individual's reputation or business not be wrongly interfered with." Hill v. New Jersey Dept. of Corrections Com'r Fauver, 776 A.2d 828, 840 (N.J. Super. App. Div. 2001).

Here, even though the memo mentions the preliminary injunction issued by this Court, the basis of the memo is Moser's failure to abide by the Separation Agreement, and not the four corners of the injunction. Therefore, this memo cannot be construed as issued to "achieve the objects" of litigation.  Cf. Williams v. Kenney, 877 A.2d 277, 289 (N.J. Super. App. Div. 2005) ("Extra-judicial statements relating to a party's honesty or credibility are usually not sufficiently relevant to clothe them with an absolute privilege.").

their business relationship and following their decision to dissolve their relationship was extreme, outrageous, and intended, and did cause, severe emotional distress.  Plaintiffs argue they are entitled to summary judgment because Moser cannot support that plaintiffs' conduct was anything other than normal workplace conduct, and that his distress--in the form of lack of sleep, weight gain and family issues--was mild.

Again, the parties apply different law--New Jersey and California--to this claim without undertaking a choice of law analysis.[22]  But, again, at this point, the Court does not need to decide which law applies because under the law of either state, plaintiffs' motion must be denied.

In New Jersey, the New Jersey Supreme Court has explained the standard for an IIED claim.

> [T]o establish a claim for intentional infliction of
> emotional distress, a plaintiff must establish
> intentional and outrageous conduct by the defendant,
> proximate cause, and distress that is severe. Initially,
> the plaintiff must prove that the defendant acted
> intentionally or recklessly.  For an intentional act to
> result in liability, the defendant must intend both to do
> the act and to produce emotional distress. Liability will
> also attach when the defendant acts recklessly in
> deliberate disregard of a high degree of probability that
> emotional distress will follow.
>
> Second, the defendant's conduct must be extreme and
> outrageous. The conduct must be so outrageous in
> character, and so extreme in degree, as to go beyond all
> possible bounds of decency, and to be regarded as

_____

[22]Plaintiffs present a brief choice of law analysis in their reply papers.

27

atrocious, and utterly intolerable in a civilized
community.  Third, the defendant's actions must have been
the proximate cause of the plaintiff's emotional
distress.  Fourth, the emotional distress suffered by the
plaintiff must be "so severe that no reasonable man could
be expected to endure it." By circumscribing the cause of
action with an elevated threshold for liability and
damages, courts have authorized legitimate claims while
eliminating those that should not be compensable.

Buckley v. Trenton Saving Fund Soc., 544 A.2d 857, 863 (N.J. 1988)

(internal citations and quotations omitted).

Similarly, in California, in order to state a cause of action

for intentional infliction of emotional distress a plaintiff must

show:

(1) outrageous conduct by the defendant; (2) the
defendant's intention of causing or reckless disregard of
the probability of causing emotional distress; (3) the
plaintiff's suffering severe or extreme emotional
distress; and (4) actual and proximate causation of the
emotional distress by the defendant's outrageous conduct.
Conduct, to be "'outrageous"' must be so extreme as to
exceed all bounds of that usually tolerated in a
civilized society.  While the outrageousness of a
defendant's conduct normally presents an issue of fact to
be determined by the trier of fact, the court may
determine in the first instance, whether the defendant's
conduct may reasonably be regarded as so extreme and
outrageous as to permit recovery.

Trerice v. Blue Cross of California,  209 Cal. App. 3d 878, 883

(Cal. App. 1st. Dist. 1989) (internal citations omitted).

A jury must determine whether plaintiffs' conduct, as alleged

by defendants, was outrageous and whether Moser's emotional

distress was severe.  In their papers, plaintiffs argue that their

conduct was not outrageous, and defendants counter that it was.  In

28

their papers, plaintiffs consider Moser's distress as typical of any high level executive, while defendants claim that Moser suffered greatly because of the humiliation and fraud inflicted on him by plaintiffs.  Because plaintiffs' conduct during the parties' business relationship is disputed, the Court is unable to find, as a matter of law, that plaintiffs' conduct was simply business. Further, because Moser's claimed emotional distress resulting from the parties' relationship is disputed, the Court is unable to find, as a matter of law, that Moser simply experienced normal workplace stress.  Morever, considering that defendants' evidence "is to be believed and all justifiable inferences are to be drawn in his favor," Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255), defendants have provided sufficient evidence[23], if believed, to support an IIED claim.[24]

## CONCLUSION

The only undisputed fact in this case appears to be the parties' desire to terminate their business relationship.  Even though there are many disputed facts that may not, in the end, be

---

[23]Defendants' evidence of outrageous conduct include fraud, blackmail, theft of intellectual property, and debasing of Moser's integrity to clients and employees.

[24]The Court notes that most of defendants' evidence is Moser's own testimony.  Because the Court cannot make credibility determinations, this serves as another basis for the denial of summary judgment.

considered material, the Separation Agreement, as well as the parties' conduct leading up to and beyond the signing of the Separation Agreement, are primary disputed issues that must be considered by a jury.  Consequently, for the reasons expressed above, plaintiffs' motion for summary judgment must be denied.  An appropriate order will be entered.

Date: <u>March 31, 2009</u>                      <u>  s/ Noel L. Hillman      </u>

At Camden, New Jersey                  NOEL L. HILLMAN, U.S.D.J.